HENRY H. HALL, Respondent, v. JOSEPH STEVENS, et al., Survivors, etc., Appellants.

Plaintiff contracted to sell defendants certain cattle, to be paid for on delivery. At the time of delivery plaintiff asked to be paid in currency, to which defendants agreed. The cattle were then weighed and taken possession of by defendants; it was then after banking hours, and they, not succeeding in procuring the currency, gave to plaintiff a bank draft for the amount, which he received. The next morning he left the draft at a bank "for collection," but received some money on it, and was credited with the balance; three days after it was protested for non-payment. The drawer bank was insolvent when the draft was issued, which fact was unknown to defendants when they delivered it to plaintiff; its credit was good, and on that day and the three following days defendants deposited large amounts with it. In an action to recover the purchase-price of the cattle, plaintiff testified that he supposed the draft was good when he took it, otherwise he would not have taken it. He made a memorandum of the transaction as follows: "Received $1,311.25 in draft." Plaintiff's counsel asked to go to the jury "upon the question whether or not the plaintiff received the draft in payment for the cattle delivered." The court refused this request, and directed a verdict for defendants. *Held*, no error; that the presumption was the draft was taken in payment, and the burden of proving the contrary rested upon plaintiff; and that the plaintiff had failed to meet the burden so cast upon him.

*It seems* the presumption that a bank draft was received in payment is stronger than in the case of a note, check or draft of an individual.

*Hall* v. *Stevens* (40 Hun, 578) reversed.

(Argued June 20, 1889; decided October 8, 1889.)

APPEAL from an order of the General Term of the Supreme Court in the fifth judicial department, made the first Tuesday in June, 1886, which granted a motion made by the plaintiff for a new trial.

This was an action to recover a balance of the purchase-price alleged to be due to the plaintiff upon the sale of certain cattle by him to the defendant at an agreed price per pound. The answer, after admitting the sale and delivery, denied that there was any balance due to the plaintiff on account thereof and pleaded payment in full.

On the 4th of April, 1882, the plaintiff, a farmer residing near Fredonia, agreed to sell to the defendants, who were

dealers in live stock at Buffalo, thirty-six head of cattle and to deliver seventeen thereof on the tenth of that month, and the remainder on the first of May following. The cattle were to be weighed upon their arrival in Buffalo, and the plaintiff was to receive six and one-fourth cents a pound for the first delivery and six cents per pound for the second. On the tenth of April, at half past two in the afternoon, the plaintiff arrived with the seventeen cattle, as agreed, and before they were weighed asked Mr Burroughs, the agent of the defendants " How it would be about the pay for the cattle," and on being asked what he wanted replied that he wanted the currency. Mr. Burroughs then said that he would step into the office and tell them so that they would have it ready. Thereupon he went to the office and soon came out stating that he had arranged that all right. The plaintiff asked him if it would not be too late for them to get to the bank before it would close, and was told that the defendants had arrangements with the bank to do business after banking hours, so that it would be all right. The cattle were then weighed, and as they left the scales were taken possession of by agents of the defendants. Thereupon the plaintiff and Mr. Burroughs went to the office and computed the amount that the cattle came to, which they agreed in making $1,311.25.

Burroughs then said to a clerk in the office : " I suppose Mr. Hall would like his currency now, as he wants to get home as soon as he can," and the clerk replied that he did not know how it would be about getting the currency, and asked if a draft would not answer. The plaintiff said that perhaps a draft might answer, but that he would prefer the currency, as he wanted to use it when he got home, and was then told that they would do the best they could for him. Nothing further was said, but the plaintiff waited for nearly two hours until the return of a messenger from the bank, which was three miles distant, when Mr. Burroughs handed him a draft, saying : " That makes you all right." The plaintiff said they had not indorsed it, but was told that it was payable to his order and was all right as it was. He said, " I suppose you

could not get the currency." Nothing further was said and the plaintiff at once started for home, taking the draft with him. The next morning he indorsed it and left it at a bank in Fredonia " for collection," but received some money on it and was credited with the balance. The drawee refused to pay it, and on April thirteenth it was duly protested for non-payment. The following is a copy of the draft:

" [Duplicate uncollected.]

## " THE FIRST NATIONAL BANK.

" $1,311.25.        BUFFALO, N. Y., *April* 10, 1882.

" Pay to the order of H. H. Hall, thirteen hundred eleven and $\frac{25}{100}$ dollars.        " F. B. BOGERT,

" *Assistant Cashier.*

" To THE FOURTH NATIONAL BANK, New York."

The First National Bank of Buffalo was insolvent at the time this draft was issued, but neither of the parties knew of the fact when it was delivered to the plaintiff. On the tenth of April its credit was still good, and so continued for some days thereafter. On that day the defendants deposited $36,000 in said bank and on the three days following, $28,000, $10,600 and $1,638.84, respectively. On the trial the plaintiff testified that he supposed the draft to be good when he took it, and that he would not have taken it if he had had any doubt about its being good. Before the commencement of the action the plaintiff tendered the draft to the defendants and demanded that they pay him the money.

At the close of the evidence for the plaintiff, the defendants having offered no testimony, his counsel asked to go to the jury " upon the question whether or not the plaintiff received the draft in payment for the cattle delivered to him " as well as upon several other questions. The court refused to send the case to the jury, and directed a verdict for the defendants. Exceptions were ordered to be heard at first instance at General Term.

Further facts appear in the opinion.

*Adelbert Moot* for appellants. This appeal is well taken and brings up a question of law. (*Met. Nat. Bk.* v. *Sirrett*, 97 N. Y. 320–325; *O'Brien* v. *Jones*, 91 id. 193; *Wohlfahrt* v. *Beckert*, 92 id. 490.) The court was correct in directing a verdict for the defendant, and the General Term erred in granting plaintiff a new trial upon his exception to the court's refusal to leave the question to the jury of whether plaintiff did or did not receive this draft in payment for his cattle. (*Tobey* v. *Barb*, 5 Johns. 68; *Whitbeck* v. *Van Ness*, 11 id. 410; *Gibson* v. *Tobey*, 46 N. Y. 637.) Plaintiff cannot recover, because the *onus* was upon him to show that he did not take the draft in payment, for the reason that the delivery of. the cattle and delivery of the draft were simultaneous acts. (*McDonald* v. *Hewitt*, 15 Johns. 349; *Mount* v. *Lyon*, 49 N. Y. 552; *Whitbeck* v. *Van Ness*, 11 Johns. 411; *Hardin* v. *Kretsinger*, 17 id. 293; 1 Duer, 388; *Breed* v. *Cook*, 17 Johns. 242; 46 N. Y. 637; *Shaw* v. *R. L. Ins. Co.*, 69 id. 286; 2 Daniel on Neg. Inst. [3d. ed.] § 1264; *Dwight* v. *G. L. Ins. Co.*, 103 N. Y. 358, 359.) The bank having been in good credit when this draft was issued, its subsequent failure and demonstrated insolvency are immaterial. (*Roberts* v. *Fisher*, 43 N. Y. 159; *Gibson* v. *Tobey*, 46 id. 637.)

*John S. Lambert*, for respondent. The evidence tends to show that the draft was not agreed by the parties to be taken in payment for the cattle, and this was a question for the jury to determine. (*Bagley* v. *Rowe*, 105 N. Y. 179.) The presumption that the draft was taken in performance of the obligations imposed by the contract, and, therefore, in payment for cattle, may be rebutted or destroyed by the declarations and acts of the parties, or the circumstances of the case. (*Osborne* v. *Gantz*, 60 N. Y. 541 *Smith* v. *Lyons*, 5 id. 41; *Whitbeck* v. *Van Ness*, 9 Johns. 310.) It was for the jury to draw the inferences, looking at all the circumstances surrounding the transaction and the declarations and admissions of the parties, and determine, as matter of fact, whether the parties intended the draft to be received in payment or not for the

cattle. (*Smith* v. *Lyons*, 5 N. Y. 41; *Hamlet* v. *Linneman*, 48 id. 399; *Darnell* v. *Morehouse*, 45 id. 69; *Tilson* v. *Terwilliger*, 56 id. 276; *Blant* v. *Gabbler*, 77 id. 461; *Parker* v. *Baxter*, 86 id. 593; *Gibson* v. *Tobey*, 53 Barb. 195.) In paying and receiving the draft, both parties acted upon the assumption and belief that certain facts existed which did not. It was a mutual mistake, and the contract based upon it can be rescinded by the party injured. In the absence of a special contract it is not payment. (*Roberts* v. *Fisher*, 43 N. Y. 159; *Johnson* v. *Weed*, 9 Johns. 311; *O. Bank* v. *Lightbody*, 13 Wend. 112.) When it appears that the drawee has no funds to pay the draft, demand of payment is excused, and whether or not the parties had made a mutual mistake should have been submitted to the jury. ( *Whiting* v. *Bank of Rochester*, 77 N. Y. 363.) By force of the contract of sale at the time of the payment of the $100, the parties having fully identified the property, the title passed to the defendants, and an indebtedness arose which could only be discharged by payment in money, or its equivalent. (*Groat* v. *Giles*, 51 N. Y. 431; *Burrows* v. *Whitaker*, 71 id. 291; *Kein* v. *Tupper*, 52 id. 550; *Roberts* v. *Fisher*, 43 id. 159.)

VANN, J. The drawer of the draft in question, although insolvent at the time of delivery to the plaintiff, continued its business of banking in the usual way with unimpaired credit for several days thereafter. As the loss had not occurred when the plaintiff accepted the draft and both parties acted in good faith, believing the bank to be solvent, the fact that it was actually insolvent has no bearing upon the question presented by this appeal. (*Lightbody* v. *Ontario Bank*, 11 Wend. 9; affirmed *sub nom. Ontario Bank* v. *Lightbody*, 13 id. 101.) As was said by Chancellor WALWORTH for the Court of Errors in that case : "It is a maxim of the law that the loss is to him who was the owner at the time such loss happened, if both parties were ignorant of the loss at the time of making their contract."

If it had been a part of the original agreement between the

parties that the plaintiff should take a draft in payment for his cattle, that would have been conclusive and would have left no question for discussion. But at the time of the sale nothing was said upon the subject, and, in the absence of an express agreement, the parties are presumed to have intended that payment was to be made in cash. As, however, upon the delivery of the cattle the plaintiff accepted a bank draft payable to his own order for the precise amount then due him, the question arises whether, under all the circumstances, the contract was impliedly modified and the draft taken in payment. Although there was no conflict in the evidence, the plaintiff claims that it was susceptible of different inferences, and thus raised a question of fact which the trial court erroneously refused to submit to the jury. This is the only ground of error alleged, and in considering it, it is important to first determine upon whom the burden of proof rested. The plaintiff having proved the sale and delivery of the cattle and the acceptance by him of a draft growing out of the transaction itself, but neither signed nor indorsed by the defendants, who was required to show whether the draft was taken as payment or as security? The answer to this question depends upon whether the draft was taken for a present or a precedent debt. If it was for the former, the presumption is that it was agreed to be taken in payment, and the burden of proving the contrary rested upon the plaintiff; while if it was for the latter, the presumption is that it was not taken as payment, and the *onus* of establishing that it was so taken rested upon the defendants. (*Noel* v. *Murray,* 13 N. Y. 167; *Whitbeck* v. *Van Ness,* 11 Johns. 409.) It is evident that the plaintiff did not intend to give credit, because there was nothing said about it; it was contrary to custom, and upon arriving with the cattle in readiness for delivery, his first inquiry was " How it would be about the pay." The answer and the acts of the defendants' agent show that they expected to pay upon delivery. The business was conducted as cash sales usually are when bulky articles are the subject of the transaction, and a little time must necessarily intervene between delivery and payment. The delivery of

property, not handed from hand to hand, cannot well be precisely simultaneous with the payment therefor.  This is especially true when animals, sold by the pound, are delivered and they have to be driven upon the scales and weighed, and the amount of the purchase computed before payment can be made.  Under such circumstances, payment and delivery can only be practically, for they cannot be actually, concurrent. As soon as the cattle had left the scales the plaintiff and the representative of defendants went to the office and each, in computing the amount paid, reached the same result.  In the conversation that followed, it was assumed that payment was to be immediate.  No request was made for time.  The subject was not even mentioned.  The difference, if it may be so termed, which arose, related not to the time, but to the method of payment.  During the delay of an hour or more, that ensued while the messenger was gone to the bank, the plaintiff waited upon the premises in readiness to receive payment on his return.  When he returned the matter was at once adjusted.  Thus it appears that neither by word nor act did the one party indicate an intention to give time, or the other even a desire for time.  There was not an absolute or unconditional delivery.  The parting with possession by the plaintiff was upon the implied understanding, necessarily arising from the circumstances, that the delivery was not to be deemed complete until payment was arrranged.  Both delivery and payment were parts of the same transaction and were practically simultaneous.  If authority is necessary upon a point so clear, the case of *Gibson* v. *Tobey* (46 N. Y. 637) may be relied upon as analogous.  The remarks of the chief judge, in delivering the opinion on pages 641 and 642, are almost as applicable to the case in hand, in this as well as in other respects, as to the case then under consideration by the court.

The presumption of law, therefore, was that the plaintiff accepted the draft of the First National Bank of Buffalo in payment and satisfaction of his demand for the cattle, and the burden of proof was upon him to meet this presumption by showing that it was not thus received.  Such presumption

is conclusive unless, as said by the court in the case last cited (page 641), "the contrary be expressly proved." By what evidence does the plaintiff claim to have rebutted this presumption?

Prior to the weighing of the cattle it is evident from their conversation that both parties expected payment to be made in currency. By the time the weighing was finished and the purchase-price computed the bank had closed; and when defendants' agent asked the plaintiff if a draft would not answer his purpose he replied that perhaps a draft might answer, but he would prefer the currency as he wanted to use it when he got home. Instead of refusing to take a draft, which was clearly his right, he intimated that he would accept one. He made no objection to a draft, as such, but expressed a preference for the currency as he wanted it for present use. He did not say that a draft was not as good or as safe as the currency, but based his preference upon his own convenience. When he was told by the defendants that they would do the best they could for him, he made no reply, although if he intended to refuse a draft, that was the natural time to say so before they sent three miles to the bank. While the clerk was gone he had time to think it over; and when the draft was finally handed to him with the remark "That makes you all right," it was incumbent upon him, if he intended to accept the draft either as security, or in case it should be paid, or upon any other condition, to then say so. He said nothing upon the subject, but looking at it said that they had not indorsed it. Thus it appears that his attention was directed to the point that if he accepted the draft, as it was not indorsed by the defendants, that they did not intend to be responsible if it was not paid. (*Breed* v. *Cook*, 15 Johns. 241.) In response to his remark that it was not indorsed, he was told that it was payable to his order and did not need to be indorsed but was all right as it was. He then said: "I suppose you could not get the currency," and thus the conversation ended. He took the draft and went home and used it. Upon the trial he testified that if he had had any doubt about its being

good he would not have taken it. Why not, if he understood that the defendants were to be responsible if the draft was not paid, as it would be so much additional security? Whether the draft was accepted as payment or not depends upon the intention of the parties to the transaction. That intent is to be gathered from their acts and declarations. With what intent, according to what was said and done, did the plaintiff receive the draft? By what word or act did he indicate an intention to accept the draft for any purpose other than that which the law imputes to him on the face of the matter?

The plaintiff also testified that he had used drafts of this character before in his business as a wool buyer, and that in a memorandum made by him of this transaction under the date when it occurred, after stating the weight of the steers and other facts, he made the following entry: "Received $1,311.25 in draft on New York from McDonough, Stevens & Dunning." The memorandum contained the computation showing that the cattle came to that sum, but it did not state with what intent or for what purpose he received the draft, leaving it to be plainly inferred that he received it with no special or unusual intent or purpose, but as he would currency, and in the place of currency.

We think that the plaintiff failed to meet the burden of proof cast upon him by the conceded facts of the case. As said by the court in *Gibson* v. *Tobey* (*supra*, 643): "If the plaintiff had not intended to have received the draft in payment, he would have said so, or required an indorsement." And in *Whitbeck* v. *Van Ness* (*supra*, 414), "it was made payable to the plaintiff himself, and the defendants, by not indorsing it, or guaranteeing the payment, clearly declined pledging their own responsibility."

Bank drafts have come to be an important medium in the transaction of business, especially where large payments are made. They are regarded as safe and convenient. Under the improved systems of banking that now prevail, the confidence

reposed in such drafts is very great. The presumption, there-fore, that a draft of this character was received in payment is stronger than in the case of a note, check or draft of a private individual.

While the rule is undoubted that questions of intent are for the jury even when the facts are undisputed, still where the intent is undisclosed, proof must be given of acts or words from which the inference may fairly be drawn that such intent existed. No such evidence appears in the record now before us. All that was said and done in connection with the delivery and acceptance of the draft is quite as consistent with an intent to accept it in payment as with the opposite intent. The evidence does not admit of conflicting inferences relating to the point in question. Moreover, the rule is " not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof rests." (*Improvement Co.* v. *Munson*, 14 Wall. 442.)

" If the proof of a fact is so preponderating that a verdict against it would be set aside by the court as contrary to the evidence, then it is the duty of the court to direct a verdict." (*Dwight* v. *Germania Life Ins. Co.*, 103 N. Y. 341, 358.)

We think that the trial court was right in directing a ver-dict for the defendants and that the order appealed from should be reversed and judgment ordered for the defendants on the verdict, with costs.

All concur, except BRADLEY and HAIGHT, JJ., not sitting, and POTTER, J., dissenting.

Ordered accordingly.