UNITED STATES v. HOCKING VALLEY RY. CO.

(District Court, N. D. Ohio, W. D. December 9, 1911.)

No. 1,357.

1. CARRIERS (§ 38*)—INTERSTATE COMMERCE ACT—VIOLATIONS.

The acceptance by a railroad company in settlement with a coal company for interstate shipments of coal made during the preceding month, sent as prepaid and settled for monthly under a general custom of the business, of notes of the coal company for a part of its freight charges, under a previous understanding and arrangement therefor, constitutes a "willful failure * * * to strictly observe its tariffs" in violation of section 6 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]), as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 (U. S. Comp. St. Supp. 1909, p. 1153), and a misdemeanor thereunder whether it be considered as an acceptance of a "less or different compensation" for the service or the extension of "privileges and facilities in transportation" not specified in its published tariffs.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

2. CARRIERS (§ 38*)—INDICTMENT FOR VIOLATION OF INTERSTATE COMMERCE ACT—SUFFICIENCY.

An indictment against a railroad company for a failure to observe its published tariffs by extending credit to a shipper under joint rates for a part of the freight due is not insufficient because it does not exclude the possibility that it received in cash its own share of such freights.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

3. CARRIERS (§ 32*)—INTERSTATE COMMERCE ACT—VIOLATION—"DISCRIMINATION."

A railroad company practices a discrimination in respect to transportation in violation of section 6 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]), as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 (U. S. Comp. St. Supp. 1909, p. 1153), in favor of one interstate shipper and against others of the same class, shipping the same commodity from the same points and under substantially the same conditions as to time of shipment, destinations, connections, and manner of transportation and other details identifying the similarity of transactions, by the device of extending credit to such favored shipper for the freight charges, and exacting and collecting such charges from the other shippers.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*

For other definitions, see Words and Phrases, vol. 3, p. 2099.

What constitutes an unlawful preference or discrimination by carrier under interstate commerce regulations, see note to Gamble-Robinson Commission Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

Criminal prosecution by the United States against the Hocking Valley Railway Company. On demurrer to indictment. Overruled.

U. G. Denman, U. S. Atty., J. G. Fogg, Asst. U. S. Atty., and John H. Marble, Sp. Asst. U. S. Atty.

James Byrne and James H. Hoyt, for defendant.

KILLITS, District Judge. An indictment has been found by the grand jury of this court in 28 counts against the Hocking Valley Railway Company, a corporation organized and existing under and by virtue of the laws of Ohio, being a common carrier operating a line of railroad wholly within such state.

The several counts divide themselves into three classifications, within which the language of each count is identical, save such changes as are necessary to involve transactions different in facts but of natures entirely similar. An abstract of one count in each of the three classifications will serve to illustrate the entire indictment. The indictment is attempted to be found under the act of 1887 to regulate commerce, and the so-called "Elkins Act" of 1903 (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1909, p. 1138]), as both were amended in 1906 (34 Statutes at Large, 584, Compiled Statutes, Supplement of 1909, pages 1155, 1156). Counts 1 to 10, inclusive, deal with monthly settlements for coal shipped as prepaid freight in December, 1908, and several months in 1909, each count relating to an individual month. Counts 11 to 20, inclusive, deal with the same monthly settlements and relate to the same transactions as those covered by the previous charges. Each of the remaining counts, 21 to 28, takes up a single car load shipment of coal, being one involved in some one of the several monthly settlements dealt with by the previous counts, and in each of these last counts reliance is had upon those terms of the law last quoted.

A brief statement of one count in each of these three classifications will be sufficient for the purposes of this opinion.

Omitting the formal averments relating to the road's location, its engagement in interstate commerce through the connections therein named, and other matters which bring the defendant company under the provisions of the act in question, and that it had complied with the law's requirements touching the publishing of its rates, count 1 avers the existence of a corporation known as the Sunday Creek Company, operating coal mines adjacent to the defendant's road at Nelsonville, Ohio, and shipping coal therefrom, and avers, in language sufficient for the several purposes, these additional facts:

That during the month of December, 1908, the defendant received from the said Sunday Creek Company coal in car load lots, and shipped the same in interstate commerce in 32 cars bound into states other than Ohio.

That each of the said cars was so received for shipment and shipped as prepaid freight, the total freight charges therefor within and without the state of Ohio to be charged against and paid by the shipper, the Sunday Creek Company.

That the total freight charges, computed by published rates for

such shipments, for the shipment of said 32 car loads of coal, were $1,823.63.

That during the same month were received from the said Sunday Creek Company for shipment and shipped to points within the state of Ohio in car load lots, as prepaid freight shipments, the freight charges therefor to be charged against and to be paid by the Sunday Creek Company as prepaid freight, in the aggregate amount for freight at the published tariff rate of $24,667.42.

That the total amount of freight charges for prepaid freight to be charged to and paid by the Sunday Creek Company to the defendant upon shipments of coal by defendant during the month of December, 1908, as aforesaid, was $26,491.05.

That a custom made inevitable because of the nature of the business and the work of accounting provided for a monthly credit for freight charges to the shippers of coal over defendant's road, including the Sunday Creek Company, for coal received to be shipped and shipped by defendant as prepaid freight, such credit to terminate with monthly settlements.

That when the regular monthly accounting for the freight for the aforesaid interstate and intrastate shipments for December, 1908, was had, on January 27, 1909, the defendant railroad made a settlement with the Sunday Creek Company therefor on these terms: In money, $1,491.05; for the balance of the $26,491.05, namely, $25,000, a promissory note executed by the said Sunday Creek Company, at four months, at 5 per cent.

That at and previous to such settlement on the terms aforesaid no demand was made by the defendant company upon the Sunday Creek Company for the payment of said prepaid freight charges wholly in money, nor was any effort made at any time to collect said charges.

That said note, interest being paid, was renewed from time to time by the defendant company until April 1, 1910, on which date it was merged, with other debts due to the defendant, into 5 per cent. debenture bonds of said Sunday Creek Company, payable April 1, 1913, which bonds are wholly unpaid.

That this settlement for 1,491.05 in cash and $25,000 in credit was the fruit of an understanding and arrangement between the defendant and the Sunday Creek Company had and existing before and at the time of each of the shipments of coal whose prepaid freight charges went to make up said amounts and up to the time of making said settlement and the taking of said note.

That "by the acceptance and taking of said note as part payment for such transportation the said the Hocking Valley Railway Company, common carrier as aforesaid, did demand, collect, and receive a less and different compensation for the transportation of such property, and for the service connected therewith between the said points of shipment, such points being named in the aforementioned tariffs, than the rates and charges which were specified in said tariffs so filed with the said Interstate Commerce Commission, and so in effect at the time of said shipments. That by the means aforesaid, to wit, the taking of said note in part payment for such transportation, the

said the Hocking Valley Railway Company did remit by said device a portion of the rates and charges so in said tariffs specified, and did extend to said Sunday Creek Company a privilege, in the transportation of its said property, not specified in such tariffs."

The count concludes with the formal charge that the defendant through these facts unlawfully demanded, collected, and received a less and different compensation for the transportation of this property and for its service in connection therewith, and unlawfully remitted a portion of the rates and charges for the transportation of such property, and that through the device of receiving and accepting said note unlawfully remitted a portion of the rates and charges for the transportation of such property so in said tariff specified, and did unlawfully extend to the said Sunday Creek Company a privilege in regard to the transportation of the property above named not specified in its tariffs, contrary to the form of the statute.

This count and 2 to 10 following are drawn to meet that portion of section 6 of the Act of 1887, as amended in 1906, which reads:

"Nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs, than the rates, fares and charges which are specified in the tariffs filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

The act of 1906 also amends the original section 6, touching the details required in the published schedules, the law now reading:

"The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part of the aggregate of such aforesaid rates, fares and charges, or the value of the service rendered to the passenger, shipper, or consignee."

It is very plain from the context that the word "tariffs," as used at the close of the first quotation above, from the law, is used in the sense of schedules, rates, and charges, and that the two provisions we quote are to be read together.

Count 11, which may be referred to as illustrative of the second classification of counts, relates to the same transaction as that set out in count 1, and follows in the main the allegations of that count, with the additional averments: That when the indebtedness arising for such transportation charges for December, 1908, arose, certain other companies and persons were engaged in the business of mining, selling, and shipping of coal in the vicinity of Nelsonville, Ohio, and shipping therefrom during said month upon the defendant's railroad and its various connecting lines in interstate and intrastate commerce and under conditions similar to and substantially like those under which shipments were made, as stated, by the Sunday Creek Com-

pany, naming some of said other persons, firms, and corporations so shipping coal. That from each said shippers so named, excepting only the said Sunday Creek Company, the defendant railroad company demanded and collected in legal money shortly after the close of the month of December, 1908, and at the time of the settlement for the business of said month, the entire amount of the freight charges due on account. of shipments sent as prepaid freight, including all of said shipments made by each of said respective shippers in interstate commerce. That to insure the collection of the freight charges on account of the transportation of property as prepaid freight in interstate as well as intrastate commerce, with monthly credits extended to each of said shippers as to the Sunday Creek Company, the defendant railroad company demanded, exacted, and obtained from each of said firms, corporations, and persons shipping coal from said Nelsonville, excepting only from the Sunday Creek Company, bonds with sureties guaranteeing the payment of the charges on such shipments from month to month. That as a part of the plan and device to favor and to grant concessions and discriminations to the said Sunday Creek Company the said the Hocking Valley Railway Company did not ask, demand, exact, or obtain any such bond from the said Sunday Creek Company. That by the taking and accepting of such note in part payment and in settlement for the charges for the transportation of coal in interstate commerce due from the Sunday Creek Company to the defendant railway company the latter unlawfully granted and gave a concession and advantage to the Sunday Creek Company in respect to the transportation of such property in interstate commerce by which device the coal was transported at a rate less than that named in the published tariffs, "and whereby, in the manner and form aforesaid, a discrimination was practiced in favor of and an advantage given to said Sunday Creek Company, by the said the Hocking Valley Railway Company in respect of the transportation of said coal so transported as aforesaid as specified in this count, in said interstate commerce for said Sunday Creek Company, and against other persons, firms, and corporations, and particularly against the other persons, firms, and corporations hereinbefore mentioned as being shippers of coal, and for whom, as aforesaid, the said the Hocking Valley Railway Company was doing like and contemporaneous service in the transportation of a like kind of interstate traffic under substantially similar circumstances and conditions, and who were each required by said the Hocking Valley Railway Company, as aforesaid, to furnish bonds to insure payments and to make timely and proper payments in money of the charges for the transportation of property so shipped by said shippers, other than said Sunday Creek Company."

Count 21, which is typical of the last eight counts, is substantially identical in wording with count 11, dealing, however, as we have said, with but one single shipment of coal from Nelsonville, Ohio, to Chicago, Ill., the prepaid freight charges of which being one of the items going to make up the amounts involved in the settlement between the defendant railway company and the Sunday Creek Com-

pany for the business done in January, 1909. The count need not be further described because of its similarity to each of counts 11 to 20, and our consideration of count 11, as illustrative of counts 11 to 21, inclusive, is applicable to count 21 and its fellows in its classification.

Counts 11 to 28 are attempted to be drawn to meet that portion of the language of the Elkins Act which was not changed by the amendment of 1906, and which reads:

"It shall be unlawful for any person, persons, or corporation to offer, grant, give, or solicit, accept or receive, any rebate, concession or discrimination in respect to the transportation of any property in interstate or foreign commerce, or by any common carrier subject to said act to regulate commerce and the acts amendatory thereof, whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such common carrier, as required by said act to regulate commerce and the acts amendatory thereof, or whereby any other advantage is given or discrimination is practiced."

[1] The government argues that the only question presented by the facts pleaded in counts 1 to 10, respectively, is:

"May a carrier subject to the act publish its rates for services subject to the act to regulate commerce in terms of money and then receive promissory notes as payment to it for such services, without violating that portion of section 6 of the act to regulate commerce which provides that no carrier shall 'charge or demand or collect or receive a greater or less or different compensation' for its services subject to the act 'than the rates, fares, and charges which are specified in the tariff filed and in effect at the time'?"

If we may take the government's position that the acceptance of a note for an amount so large as to necessarily include at least $332.58 of its charges against the Sunday Creek Company for prepaid interstate freight charges for December, 1908, as shown in count 1, was a "payment" of that portion of such charges not paid in cash, the answer to its question is easy. The situation would clearly involve the defendant in a violation of those provisions of the law above quoted. But the difficulty lies in finding in the indictment allegations of fact warranting such an assumption. Undoubtedly the law is characterized accurately and fairly in the indictment, that, it provides, "in substance, that corporation common carriers, engaged in the transportation of property in interstate traffic, should charge and collect in legal money, from shippers, the full and exact amount of transportation charges as determined and fixed by the published tariffs and schedules."

In Louisville & Nashville R. R. v. Mottley, 219 U. S. 467, 475, 477, 479, 31 Sup. Ct. 265, 267 (55 L. Ed. 297), an injured passenger had released the company from liability for damages in consideration of free passenger transportation during his life. The Supreme Court held that continued observance of its obligation under this agreement with Mottley made the company an offender against the law, saying:

"But the act of June 29, 1906, made a material addition to the words of the act of 1887; for it expressly prohibited any carrier, unless otherwise provided, to demand, collect, or receive 'a greater or less or different compensation' for the transportation of persons or property, or for any service in

connection therewith, than the rates, fares, and charges specified in the tariff filed and in effect at the time. We cannot suppose that this change was without a distinct purpose on the part of Congress. The words 'or different,' looking at the context, cannot be regarded as superfluous or meaningless. We must have regard to all the words used by Congress, and, as far as possible, give effect to them. Market v. Hoffman, 101 U. S. 112, 115 [25 L. Ed. 782]. The history of the acts relating to commerce shows that Congress, when introducing into the act of 1906 the word 'different,' had in mind the purpose of curing a defect in the law and of suppressing evil practices under it by prohibiting the carrier from charging or receiving compensation except as indicated in its published tariff. * * * The evident purpose of Congress was to establish uniform rates for transportation, to give all the same opportunity to know what the rates were as well as to have the equal benefit of them. * * * That money only was receivable for transportation is the basis upon which the Interstate Commerce Commission has proceeded; for, in one of its conference rulings (207) issued in 1909 (1906), the commission held that nothing but money could be lawfully received or accepted in payment for transportation, whether of passengers or property, for any service connected therewith; 'it being the opinion of the commission that the prohibition against the charging or collecting a greater or less or different compensation than the established rates or fares in effect at the time precludes the acceptance of service, property or other payment in lieu of the amount specified in the published schedules.' It is now the established rule that a carrier cannot depart to any extent from its published schedule of rates for interstate transportation on file without incurring the penalties of the statute. That rule was established in execution of a public policy which, it seems, Congress deliberately adopted as applicable to the interstate transportation of persons or property. The passenger has no right to buy tickets with services, advertising, releases, or property, nor can the railroad company buy services, advertising, releases, or property with transportation. The statute manifestly means that the purchase of a transportation ticket by a passenger and its sale by the company shall be consummated only by the former paying cash and by the latter receiving cash of the amount specified in the published tariffs. * * * The purpose of Congress was to cut up by the roots every form of discrimination, favoritism, and inequality, except in the cases of certain excepted classes to which Mottley and his wife did not belong, and which exceptions rested upon peculiar grounds. * * * The words of the act, therefore, must be taken to mean that a carrier engaged in interstate commerce cannot charge, collect, or receive for transportation on its road anything but money."

Again, in C., Ind. & L. Ry. Co. v. United States, 219 U. S. 486, on page 496, 31 Sup. Ct. 272, on page 274 (55 L. Ed. 305) the court say:

"The legislative department intended that all who obtained transportation on interstate lines should be treated alike in the matter of rates, and that all who availed themselves of the services of the railway company (with certain specified exceptions) should be on a plane of equality. Those ends cannot be met otherwise than by requiring transportation to be paid for in money which has a certain value known to all and not in commodities or services or otherwise than in money."

The language of the indictment, however, is such as to leave something to the operation of a doubtful presumption before we can say that the taking of the note was a "payment of the charges to the extent of its face." Considering that the charges in question are described as prepaid, which involves the idea of payment before service, the effect of the allegation that the cash payment ($1,491.05 of the $26,491.05 actually due at the settlement) "was so taken and accepted in pursuance of an arrangement and understanding had and

existing before and at the time of said shipments and up to the time of making said settlement and the taking of said note, to wit, * * * between said the Hocking Valley Railway Company and said Sunday Creek Company, and their respective officers and agents," is to relate the act of settlement on that basis to the time of making the charge as "prepaid." The defendant cannot object to so treating the transaction if, in this particular, the indictment states the facts.

These allegations, then, require us to regard the giving of credit for $25,000, involving these $332.58 at least of interstate charges as contemporaneous with the creation of the debt, but, considering the clarity requisite in a criminal pleading, they do not warrant our holding that the taking of the note should be related to the time when "prepaid charges" should have been prepaid in fact. The pleading does not state that the "arrangement and understanding" in effect at the time of creating the charges involved in terms the acceptance of a note for any part of them. The allegation is simply that the understanding related to the acceptance of a small installment in cash. In an indictment every doubtful meaning must be resolved against the pleader. We are compelled, therefore, to regard the taking of the note as applicable to an antecedent indebtedness, as to which the law is that an express agreement to that effect must be pleaded and shown before acceptance of a promissory note will be taken as payment. Merrick v. Boury, 4 Ohio St. 60; Hall v. Stevens, 116 N. Y. 201, 22 N. E. 374, 5 L. R. A. 802; Atlas S. S. Co. v. Colombian Land Co., 102 Fed. 358, 42 C. C. A. 398.

At this point, therefore, we are with the defendant that the facts as pleaded show nothing more than an extension of credit to the Sunday Creek Company, but we do not accept defendant's further contention that they present the still smaller issue, namely, the right of the company to extend longer credit to the Sunday Creek Company than to its rivals and thus to violate a custom rather than a law, which defendant assumes to be the only question presented.

Plainly, there is reason in the indictment's statement that "necessity and convenience" created a custom for a charge of prepaid freight to the user to be settled monthly after checking and auditing. We must assume that Congress legislated in this act with reference to the exigencies of the business and with a view to assist it rather than to hamper it, and neither the context nor the spirit and purpose of the act suggest the abrogation of the rule of common law that criminal intent is a necessary ingredient of an offense under it. The custom being one making not only for the convenience of both shipper and carrier, but also born of necessity in the facilitation of transportation, one with a fruitage of better public service, uniform observance of it cannot be imputed for a violation of the law, however superficially it may appear to be inconsistent with the exact letter. Besides, as we shall notice later, it is a "willful failure" to observe this section of the act that is imputed a misdemeanor. Uniform observance of so beneficial a custom can hardly be said to be a willful failure.

But do not the facts pleaded establish an offense? Is not even the extension of credit, as the fact is charged here, a violation of the act of 1906? The court is not bound in answering this question to look only to those provisions of the law which either the government or defendant or both assume are alone applicable. The fact that the government in the margin of its indictment opposite the beginning of each of its counts numbers 1 to 10 places the words, "Act to regulate commerce, section 6," and argues only in its brief the provisions we quote above, does not prevent the consideration of other language of the statute and provisions in pari materia. Nor is the court concluded by the government's formulation of the question which it assumes the facts present, which we have quoted above. Taking up defendant's challenge, the whole law should be considered, and the whole law is not only those parts of the act of 1906 which are in pari materia and germane to the facts pleaded, but the entire law to regulate commerce as that act amends it. We cannot be asked to treat separately that part of the Hepburn act which affects in terms to amend the original act to regulate commerce from that part which puts changed reading into the so-called Elkins act. In effect, the act of 1906, in its section 2, brings together provisions dealing with the same subject matter, and to be read with reference to each other just as if they were originally enacted together, section 6 of the act of 1887, as amended in 1889 (Act March 2, 1889, c. 382, § 1, 25 Stat. 855 [U. S. Comp. St. 1901, p. 3156]), and section 1 of the act of 1903 (the Elkins law), and then injects these provisions into the main act for its amendment, so that the whole is to be considered together.

We have, then, a law the spirit and purpose of which is, as the Supreme Court said in the Mottley Case, to root out every form of discrimination, favoritism, and inequality, one which will, as the court says, in Armour Packing Co. v. United States, 209 U. S. 56, 72, 28 Sup. Ct. 428, 432 (52 L. Ed. 681), "proceed upon broad lines, and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service under the same conditions should be the one established, published, and posted, as required by law. It is not so much the particular form by which, or the motive for which, this purpose was accomplished, but the intention was to prohibit any and all means that might be resorted to to obtain or receive concessions and rebates from the fixed rates duly posted and published." We have a law, then, which, when we attempt to enforce it penally, we must consider with reference to the spirit and purpose of its enactment and harmonize the letter therewith, if that may be done reasonably. In United States v. Lacher, 134 U. S. 624, page 628, 10 Sup. Ct. 625, page 626 (33 L. Ed. 1080), the court say:

"As contended on behalf of the defendant, there can be no constructive offenses, and, before a man can be punished, his case must be plainly and unmistakably within the statute. But, though penal laws are to be construed strictly, yet the intention of the Legislature must govern in the construction

of penal as well as other statutes, and they are not to be construed so strictly as to defeat the obvious intention of the Legislature."

It is unnecessary to cite the easily found additional mass of authority, for this is a controlling canon of interpretation entirely applicable in this case and to the facts pleaded here. We therefore adopt the reasoning of the court in United States v. Williams (D. C.) 159 Fed. 310, 313:

"That, while it is true that before a case can be held to fall within a penal statute the case must come within the letter and spirit of the statute, yet, if it comes within the spirit and also within one reasonable interpretation of the letter of the statute, it is sufficient, although there may be a literal construction that might be put upon the statute which would not include the case."

We have quoted above the words of Justice Harlan in the Mottley Case that "the statute manifestly means that the purchase of a transportation ticket by a passenger and its sale by the company shall be consummated only by the former paying cash and by the latter receiving cash of the amount specified in the published tariffs;" and it is obvious that this observation is applicable as well to freight transportation as to passenger. Bearing in mind the mischief to which the statute was directed, is it not fairly within its letter, as it surely is within its spirit, to hold that a published tariff, expressing rates in terms of money, implies unmistakably a cash transaction, and which is to be consummated by the payment of "ready money or money in hand, either in current coin or other legal tender, or in bank bills or checks paid and received as money"? In re Palliser, 136 U. S. 257, 263, 10 Sup. Ct. 1034, 1035 (34 L. Ed. 514). The court there observes:

"A sale on credit is not, ordinarily speaking, and in the absence of any evidence of usage, a sale for cash within the meaning of that word as used in the statutes or contracts."

So it seems to us, considering, we repeat, the purpose of the act and the mischiefs against which it is directed, an extension of credit is against the clearly implied terms of the published tariff rates, and a granting of the same does not meet the evident purpose of those provisions of the act which deal with this subject.

The thought of the court in New Haven Rd. Co. v. Interstate Commerce Commission, 200 U. S. 361, 391, 26 Sup. Ct. 272, 277 (50 L. Ed. 515), is that which we seek to apply here:

"Now, in view of the positive command of the second section of the act, that no departure from the published rate shall be made 'directly or indirectly,' how can it in reason be held that a carrier may take itself from out the statute in every case by simply electing to be a dealer and transport a commodity in that character? For, of course, if a carrier has a right to disregard the published rates by resorting to a particular form of dealing, it must follow that there is no obligation on the part of a carrier to adhere to the rates, because doing so is merely voluntary. The all-embracing prohibition against either directly or indirectly charging less than the published rates shows that the purpose of the statute was to make the prohibition applicable to every method of dealing by a carrier by which the forbidden result could be brought about. If the public purpose which the statute was intended to accomplish be borne in mind, its meaning becomes, if possible, clearer. What was that purpose? It was to compel the carrier as a public agent to give

equal treatment to all. Now, if by the mere fact of purchasing and selling merchandise to be transported a carrier is endowed with the power of disregarding the published rate, it becomes apparent that the carrier possesses the right to treat the owners of like commodities by entirely different rules. That is to say, the existence of such a power in its essence would enable a carrier, if it chose to do so, to select the favored persons from whom he would buy and the favored persons to whom he would sell, thus giving such persons an advantage over every other, and leading to a monopolization in the hands of such persons of all the products as to which the carrier chose to deal."

So here, considering what is to be accomplished by the law respecting rates and their collection, if there is room in it for favor to one shipper over another by the extension of credit, the law fails, for there still is clear opportunity to the carrier to determine whether it will receive from the favored shipper a less or different compensation than the rates applicable to the case. The exercise of judgment in the carrier in giving credit which the law then would uphold is the same which the law would sustain respecting the continuance and extent of credit, and the advisability of attempting collection at any time in whole or part. The option remains with the carrier to collect in the credit and get full rates with perhaps interest, or to carry the credit and so increase the line, or defer the collection until it is impossible to obtain full rates. Once it is conceded that credit may be given, as defendant claims the right here, with that concession runs the right of the creditor to compromise, adjust, or even forgive the debt. The opportunity in such a construction for evading the law is so obvious that, if it is the proper one, the law is an absurdity.

The court is not required to determine whether the extension of credit is the acceptance of a less or different compensation, or whether it is the extension of a privilege or facility not specified in the tariffs, in order to conclude that in it, as a favor to one shipper, the law is violated. The fact that the statute points out four classifications of acts of commission which are held unlawful does not mean that acts of omission are not equally so. The statute, to be effective, must put it out of the power of the carrier to treat differently shippers making contemporaneous shipments of the same class, and it seems clear to the court that an implication is necessary and obvious, both in the letter and spirit of the act, that collection of the published rates is to be either contemporaneous with the service or made in advance. The court may take judicial notice not only of the prevalent custom to this effect, but of the business consideration which makes the custom necessary, that the carrier may retain the means to best serve the general public, and we may construe the law in the assumption that Congress legislated with reference to such custom and business consideration.

As we have noted above, the deviation from cash collections, due to inconvenience and delay in carriage involved in collecting and accounting immediately for each shipment, out of which has arisen the custom of charging for prepaid freights to be settled monthly upon accounting for tare and other incidentals of the traffic, is apparent only. The transaction under these circumstances is substantially

cash, to be considered as contemporaneous with the service. We shall have occasion in discussing the demurrers to the subsequent counts to treat of this again, but, as applicable here especially, we suggest anew that, having accepted the coal on a prepaid basis, the defendant ought not to be heard to claim that it was not in fact prepaid.

If the court were forced to choose in relating a deliberately planned and executed extension of credit for prepaid freights to a favored shipper to one of the two reprehended acts of commission—the acceptance of a "less or different compensation" or the extension of "privileges or facilities in transportation"—it would, with the apparently better reasoning, refer it to the first class; for, as we have seen, the act affords the carrier the uncontrolled choice to say just how much, if any, of the published rate of compensation it will collect eventually from the favored one, although there is good ground for argument that it may come within both provisions, notwithstanding the apparently cogent reasoning of defendant's counsel that the "privileges or facilities" understood by the statutes are those which have to do only with the mechanics and physics of "transportation." This last word is obviously not used in its commonly accepted meaning of "act of transporting or state of being transported" (Webster's International Dictionary [Ed. of 1910]), for the first section of the Hepburn act expressly widens its definition, and applies it to instru-. mentalities and even services in transportation in the narrow sense of the word.

We do not understand that the maxim, "Expressio unius exclusio alterius," applies to limit the extended meaning of the word exactly to the particulars mentioned in the law's definition, especially as lexicographers recognize a colloquial use of the word as involving the credentials which give the possessor the right to have carriage. Webster's International Dictionary (Ed. of 1910).

The language here used, "Privileges or facilities in transportation," as well as the words, "all privileges and facilities granted or allowed," in the paragraph which prescribes what shall go into the schedules, are part of the amendment of 1906. "Privilege" has different meaning from "facility." There is no synonymity between them; and it takes the elaborate argument of defendant's counsel to get us away from the first and almost abiding impression that a chance to get one's goods transported on credit is a "privilege in transportation." The law is specifically directed to compelling carriers to uniformly collect money for carriage. Transportation of goods without compensation is wholly unlawful and impossible under it.

The indictment pleads that the act complained of violates the law in both particulars, and, if we are correctly construing the statute. then the failure of the defendant to collect the full amount of the interstate charges for December at the December settlement in the following month, being an omission due to an arrangement and understanding had before the services of the carrier were engaged by the shipper, becomes on the part of the defendant a "willful failure * * * to strictly observe its tariffs," an act which is made a mis-

demeanor, whether it is referable to the one particular or the other or both.

[2] It is no objection to the indictment that it does not exclude the possibility that in collecting $1,491.05 the defendant received payment in full of all its share of the interstate rates which the Sunday Creek Company's shipments involved. The point is fully met by the decision in C., B. & Q. Ry. Co. v. United States, 157 Fed. 830, 85 C. C. A. 194, affirmed by the Supreme Court, 209 U. S. 90, 28 Sup. Ct. 439, 52 L. Ed. 698, and also the decision of the Supreme Court in the Packing Cases, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681.

The demurrers to each of counts 1 to 10 are therefore overruled.

[3] As we interpret counts 11 to 28, respectively, the question raised is whether a carrier, under the act to regulate commerce as amended in 1906, practices a discrimination in respect to transportation, as forbidden by that law, in favor of one shipper and against others of the same class, shipping the same commodity, from the same points and under substantially the same conditions as to time of shipment, destinations, connections, and manner of transportation, and other details identifying the similarity of transactions, by the device of extending credit to such favored shipper for the freight charges on such shipments by it, while exacting and collecting cash compensation for such substantially similar shipments from the other shippers in question.

To be sure, counsel for the defendant argue that the indictment does not state that credit was denied to any of the other shippers occupying the same relation, in that capacity, in which the Sunday Creek Company stood to defendant company, but it is averred very clearly that from each of such shippers other than the Sunday Creek Company the defendant exacted a bond as security that each of said shippers would pay, as cash payments after accounting and auditing, the same prepaid freight charges for which their rival, the Sunday Creek Company, was getting a credit as the result of a private understanding with the carrier that it should have that favor. The averment of such an exaction as this is sufficient to present an attitude of discrimination in favor of the Sunday Creek Company in this respect. The essential part of each count touching the charging portion is that the defendant, in the manner and form stated, gave—

"a concession and advantage to the said Sunday Creek Company, * * * whereby and by which said device of taking and accepting the said note the said property * * * was transported * * * at a rate less than that named in the said tariffs, * * * and whereby, in the manner and form aforesaid, a discrimination was practiced in favor of and an advantage given to the said Sunday Creek Company * * * in respect of the transportation of said coal so transported as aforesaid * * * in said interstate commerce for said Sunday Creek Company, and against other persons, firms, and corporations * * * for whom the said the Hocking Valley Railway Company was doing like and contemporaneous service," etc.

We are not with defendant's counsel in their criticism of this language, for we do not read it as bringing a complaint against defendant for giving a "concession and advantage," but for practicing a

discrimination in favor of the coal company by means of devices which worked a concession and advantage to the latter, nor do we think that the language used in the pleading warrants either the court or defendant to limit the meaning of the word "concession" to that given it by the statute as fundamental to an offense. The word is used in the indictment, as the context makes plain, in its ordinary acceptation of something yielded or allowed. "A boon" is one of Webster's definitions. Counsel's construction distorts the pleading. The exact part of the statute invoked by it is that which makes it unlawful to engage in a practice whereby "property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier * * * or whereby any other advantage is given or discrimination is practiced"; the "discrimination" inhibited being, of course, such as that which is "in respect to transportation."

The count, then, is substantially in the words of the statute, and the court's task is to determine whether the extension of credit pleaded here is, under the circumstances pleaded, an unlawful discrimination. That the act is in respect to transportation there seems no reason to doubt, even if we construe the word no more liberally than do defendant's counsel. The credit is with reference to freight charges for transportation, and therefore is with respect thereto, notwithstanding the elaborate argument to the contrary. The court in construing a statute is not called upon to refine its words to an extreme nicety of thought, nor to apply microscopic distinctions in the meanings of words. The analysis of neither a criminal statute nor an indictment thereunder is an excursion in dialectics. The underlying purpose of the statute is to be observed in construing its words and phrases, which are to be given their ordinary acceptation, unless the latter is clearly modified by usage or definition peculiar to the statute; and the attempt to predicate on the facts alleged an offense is to be considered reasonably by applying those inferences and conclusions which apparently flow naturally from such facts, and which appeal to men of average intelligence as the proper deductions therefrom. The time for keenly analytical reasoning in an effort to discover, in either a statute or an indictment, loopholes of escape by engaging in finely spun discriminations of meaning or by offering turns of thought of which the language is found capable only after deep cogitation disappeared in criminal practice with the passing of the extreme punishments anciently visited on slight offenses. Paying freight charges in common and reasonable acceptation is doing something in respect to that transportation which authorizes the imposition of such charges, especially as the term is used in a statute which makes it obligatory upon a carrier to put a charge upon his act of transporting. Transportation and a charge therefor to be collected by the carrier are concomitant, inseparable. One cannot exist legally without the other.

The first impresssion one gets from the statement of the facts is that the Sunday Creek Company was substantially favored by the device in question; that it was given, by the defendant, a decided

advantage over its fellows in business at Nelsonville, and further study of the situation tends in no wise to weaken that early feeling. Discrimination in ordinary understanding and definition is the act of treating differently; it is the antithesis of advantage; one who enjoys an advantage over another at the hands of him with whom they have common dealing has his fellow within a corresponding discrimination; the positive measures the extent of the negative. Section 2, from the beginning in 1887, has defined an "unjust discrimination" to be the direct or indirect charging, demanding, collecting, or receiving from any person or corporation a greater or less compensation for transportation service "by any special rate, rebate, drawback, or other device."

If we are correct in our reasoning and conclusion touching counts 1 to 10, and all of the discussion there had is applicable to the consideration of the remaining 18 counts in this particular, and it is proper, in the case, to hold that the acts and device complained of violate the provisions specific to the amendment of 1906 against the collection, etc., of a less or different compensation, then the question is answered against the demurrers to counts 11 to 28, respectively, for then the definition of section 2 applies. The act is not only a discrimination, but specifically "unjust," and consequently an offense under the statute. If we are wrong in this respect in holding for the first 10 counts, there still remains to consider the conduct of defendant, as set forth, and the results flowing from such acts, to determine whether there is here a "discrimination in respect to transportation" obnoxious to the Elkins act, which, as the court in Armour Packing Company v. United States, 209 U. S. 56, on page 72, 28 Sup. Ct. 428, on page 432 (52 L. Ed. 681), says—

"proceeded upon broad lines and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service, under the same conditions, should be the one established, published, and posted as required by law. It is not so much the particular form by which or the motive for which this purpose was accomplished, but the intention was to prohibit any and all means that might be resorted to to obtain or receive concessions and rebates from the fixed rates duly posted and published."

The Supreme Court has reiterated this purpose and intent and effect of the statute in every case before it, whether civil or criminal, in so many turns of language and differences of expression as to leave hardly the least opportunity for the escape from the law's operation for any situation which appeals to common understanding and intelligence to depart from equal favor and just treatment to all shippers in common relation to the carrier that it is difficult to relieve the situation before us of the application of the decisions in their cumulative effect, and were it not for the great reliance of defendant's counsel upon the language of Judge Kohlsaat, in United States v. Wells Fargo Express Company (C. C.) 161 Fed. 606, 610, and upon the decision of Gamble-Robinson Commission Company v. Chicago & N. W. Ry. Co., 168 Fed. 161, 94 C. C. A. 217, 21 L. R. A. (N. S.) 982, we would feel our duty done in concluding this opinion against the demurrers at this point.

Before considering these cases, and as preliminary thereto, we revert again to the Packing Cases, and ask attention to the opinion therein, page 71, 209 U. S., p. 431, 28 Sup. Ct. (52 L. Ed. 681), wherein the court emphasizes the attempt of Congress, in repeated amendments, to make the statute more and more effective by discussing the enlarged meaning given to the word "device," as used in the Elkins act, saying that the word is therein found—

"disassociated from any such words as 'fraudulent conduct, scheme, or contrivance,' but the act seeks to reach all means and methods by which the unlawful preference of rebate, concession, or discrimination is offered, granted, given, or received. Had it been the intention of Congress to limit the obtaining of such preference to fraudulent schemes or devices, or to those operating only by dishonest, underhanded methods, it would have been easy to have so provided in words that would be unmistakable in their meaning. A device need not be necessarily fraudulent. The term includes anything which is a plan or contrivance. Webster defines it to be 'that which is devised or formed by design; a contrivance; an invention; a project,' etc."

The use of Judge Kohlsaat's dictum (page 610, 161 Fed.), upon which counsel for the defendant pivot an argument that the present law is inoperative in the present instance because indefinite, is ingenious, but not persuasive. As we understand the position of Judge Kohlsaat, which, after all, was mere dictum, neither noticed nor followed in the subsequent affirmation of his judgment by the Supreme Court (212 U. S. 522, 29 Sup. Ct. 315, 53 L. Ed. 635), it is that the word "discrimination" as used in the Elkins law is to be given its common acceptation, which, as the court observes, involves the idea of unjust distinction, wherefore the adding of an adjective, "unjust" or "unreasonable," is tautological as representing an idea already fixed in the noun "discrimination." Upon this substance defendant's counsel predicate the point that the law leaves it to each jury to determine the scope of its operation, and makes possible that in the same state of facts one jury may find an offense and another nothing reprehensible, and therefore one engaging in practices susceptible of a characterization of discrimination cannot know in advance whether he is violating a law. The argument is advanced, therefore, that the law, as attempted to be applied here, is void for indefiniteness. Two considerations occur here: First, that such an argument has no place in support of a contention that this act, being in derogation of the common law, must be construed strictly, for the reason that in the common law the same assumed indefiniteness obtains with reference to much inhibited and punishable conduct of private agencies attempting public service in respect to their treatment of a public entitled to equal consideration in circumstances substantially similar; second, the point overlooks the function of the court in an attempt to enforce the law criminally. It is for the court to first pass upon the application of the law to the facts which a prosecution offers against a defendant. The proper performance of this duty leaves to the jury, to the prejudice of the defendant on trial, no latitude for speculation on the question which is the court's alone. The court in such a case deals with a descriptive noun of long-established usage, having a meaning which appeals to the understanding, and meets the compre-

hension of every one of average intelligence who uses the English language. Its usage in the nomenclature of the railroad business is, at least, not peculiar; on the contrary, it is therein a well-understood term with a meaning right in the line of its ordinary acceptation. Hines v. W. & W. R. Co., 95 N. C. 434, 59 Am. Rep. 250. We see no occasion for alarm that the construction which defendant's counsel contend against may involve the carrier in mazes of complaints involving matters of little consequence in which one shipper may complain that he is not receiving precisely and exactly the same detailed consideration which he thinks his competitor is obtaining. Criminal law, as well as civil, honors the maxim, "De minimis non curat lex," which has controlling application to the enforcement of a statute which aims at the repression of real and substantial abuses in transportation of a kind known and appreciated by all in the business as well as by the general public. In connection with the use made of Judge Kohlsaat's opinion, we note his observation that the construction of the act of 1906 asked for by the government is not necessary to be made, "bearing in mind the general trend of the statute and amendments thereof," and, saying, page 610 of 161 Fed.:

"It is, however, evident that the passage of the acts of 1903 and 1906 contemplated a more effectual enforcement of the statute. The requirements are made more specific and the prohibitions more emphatic."

And again, on page 617 of 161 Fed., quoting with approval from the brief of the carrier company that "the purpose of that statute [the, Elkins act] was to prescribe penalties and supply remedies for the better and more effectual enforcement of the interstate commerce act," he says (page 618 of 161 Fed.): "The amendments of 1906 infuse greater vitality into the act." This language is idle if the dictum relied upon by counsel for defendant can be fairly used for the purpose attempted.

We have observed above that, the law having been enacted to apply to a business in which the custom as well as the exigencies of the business made compensation for and rendition of service substantially contemporaneous, wherefore an implication necessarily arises that the schedule of rates must be observed in cash collections, the statute is not to hamper the honest business of the carrier, but to encourage and facilitate it. It cannot be employed to curtail any opportunity to secure to the carrier its full compensation, and no apparent discrimination which is effectual to accomplish that end is under the inhibition of the law. Here is where the case of Gamble-Robinson Company v. C. & N. W. Ry. Co., 168 Fed. 161, 94 C. C. A. 217, 21 L. R. A. (N. S.) 982, is found to depart from defendant's case before us. There the alleged discrimination is nothing more than conduct designed to secure the company's full rates, and to save embarrassment and trouble involved in dealing, after the service, with troublesome shippers who show a disposition to be captious touching the carriage of products "perishable in their nature, of a character which renders them susceptible to claims for errors in charges for transportation and for damages during transportation." The credit which the court upholds as proper under the law is evidently nothing more than the

credit which continues while the goods are undelivered to the consignee and while the lien for carriage is held by the carrier. This is plain from the fact that the majority opinion unquestionably limits its force to circumstances substantially similar, and in which articles of commerce of like infirmities are involved. Aside from the difference in character of the commodities, the two cases would be apposite only if the carrier in the case before us had actually made its collection from the Sunday Creek Company, for then in this case, as in that, the only possible discrimination would be predicated upon the exaction from some shippers of bonds to secure payments, and the relief of others from the same requirement. The parallel ceases and a divergence destructive of the Gamble-Robinson Case as authority appears when we consider that here is not an effort to secure payment, as there, but a granting of a different credit from that which Gamble-Robinson Company claim it should have, a credit which is not influenced by the character of the commodity but by a desire to extend a favor, as to which no other reasonable inference is possible, a credit, too, which, the wider it goes, the more is weakened the authority of the law to compel defendant to treat all its shippers with equality. In this case, the weapon which a majority of the Circuit Court of Appeals for the Eighth Circuit upholds as one of defense is used as one of offense to put defendant in position to engage, at its option, in the very mischief at which the law is specifically aimed.

We are not impressed with the argument which asks the government to defer its objection until the defendant chooses, by definitely abandoning its claim against its debtor, to exercise its option. The offense is complete when the shipper is given the privilege to do business upon the capital of the carrier, which must strike any one of fair intelligence as such a substantial advantage over competitors as to involve them, with respect thereto, in a corresponding substantial discrimination. Nor does it appeal to us that the circumstance is nothing more than the loaning to the coal company of money belonging to the carrier, for the reason that one's imagination suffers no strain in anticipating the argument of the same counsel if the circumstances were used upon which to base a claim of ultra vires on the theory that the railroad company was acting as banker for the Sunday Creek Company.

Of course, it is not practicable for Congress to set a limit on human ingenuity in the devising of schemes obnoxious to the act to regulate commerce by attempting a description of all possible methods. The act accomplishes its end by directly and unmistakably condemning results, wherefore every devisable plan to produce the objectionable conditions is under its ban. Surely our jurisprudence is not so inept and feeble that a statute exhibiting a definite purpose to meet palpable mischiefs must be construed so narrowly as to oblige Congress from time to time to amend it that its provisions may be kept, at the best, only in the immediate rear of a procession of new methods born of the fertility of human invention and designed to circumvent that legislative will which it attempts by each amplifying amendment to express.

Before December, 1908, the courts had spoken with such uniform emphasis as to the broad scope of the statute that it would seem that one filled with a genuine anxiety to obey the law, when he knew what it was, need make no other inquiry than to ask himself what he hoped to effect by a line of conduct occupying his mind. If it is, by a new method or by one not specifically described in the statute, to accomplish that which the act aims to prevent, the contemplated action is against the statute. So considered, the statute is not indefinite; and in this light we hold that it must be construed. The law condemns the means by condemning the end which gives character as a violation of the law to the device which effectuates such end. If extending credit for freight charges to one shipper while exacting cash payments from his competitor in similar and contemporaneous enterprises is not extending an advantage to such shipper which involves a correlative discrimination in respect to transportation against those not so favored, the court is wholly in error. If it is the practice of such a discrimination, then the act is fully covered by the explicit language of the statute, for the means to such end readily meet the definition of a "device," as that term is used in the law.

As we have heretofore suggested, the impression comes quickly and abides tenaciously that such treatment is a decided advantage to the one so favored, an advantage which is as measurable and substantial as the inevitable discrimination which it creates against those who are compelled to compete in business on the basis of such partiality.

Thus viewing the law, the demurrers to counts 11 to 28 respectively, are severally overruled.