## Shakarian v. American Insurance Company

Before Soffel, Montgomery and Thompson, JJ.

*Charles M. Donley*, for plaintiff.

*J. Lawrence McBride* and *Dickie, McCamey, Chilcote, Reif & Robinson*, for defendant.

THOMPSON, J., September 23, 1952.—This case involves the construction of a clause in a fidelity insurance contract. Counsel have agreed upon a statement of facts, which was filed of record on May 2, 1952. A summary of so much of the statement of facts as is needed for our present consideration is as follows:

Plaintiff, doing business as the Lackzoom Health Stores, and having as a part of his business a milk and milk products processing plant, obtained from defendant, the American Automobile Insurance Company, a policy of insurance wherein defendant "agreed to indemnify the plaintiff up to the amount of $2,500.00 against any loss of money or other property, real or personal, belonging to the insured, which loss the insured shall sustain *through any fraudulent or dishonest act committed by an employee* while in the regular service of the insured in the ordinary course of the insured's business during the term of the policy".

Robert C. Small was employed as a truck driver by plaintiff. His duties, inter alia, were "to make deliveries of milk and milk products during the hours of 8 a.m. to 5 p.m. from plaintiff's plant aforesaid". In order to make these deliveries, Robert C. Small had plaintiff's permission, to use a certain one-half ton Chevrolet truck owned by plaintiff and was given a duplicate set of keys to the truck. The employe's normal daily deliveries were finished generally between

the hours of 4:30 and 5:30 p.m. at which time plaintiff's employe would return with the truck to the plant to unload any extra milk or milk products, which were not delivered that day. This employe was instructed after unloading the extra milk or milk products to park the truck behind the plant and lock it with the duplicate keys at the end of each day's deliveries.

On one occasion plaintiff permitted the employe to drive the truck to the employe's home to move some clothes to another address. On this occasion the truck was returned to the plant and was not retained over night by the employe.

On another occasion plaintiff was informed by the employe that the truck needed to be greased and lubricated and the employe was permitted for this purpose to drive the truck home with him in the evening, have it greased and lubricated and to return with it to work the following day.

On two other occasions the employe was unable to complete his daily deliveries within normal working hours and plaintiff on these occasions requested the employe to complete the deliveries in the evening after working hours, and to drive the truck to his home after completing the late deliveries, and requested that the employe return with the truck the following morning.

On all of the above occasions, the employe returned the truck as instructed. The employe, except as hereinbefore stated, "was never given permission by the plaintiff to drive said truck to his home or otherwise on a mission of his own".

On several occasions the employe "without plaintiff's permission, knowledge or consent, drove said truck to his home after normal working hours for his own convenience in getting thereto", and on all such occasions returned the truck to the plant the following morning.

On September 29, 1951, while the above-mentioned contract of insurance was in effect, the employe, after finishing his daily deliveries and *"without permission from the plaintiff to do so drove the truck to his home for his own convenience in getting thereto.* After driving said truck to his home, said employe did cause said truck to be wrecked and damaged while operating it *on a mission of his own on Brownsville Road at or about 3:30 a.m."* (Italics supplied.) It was the employe's intention to return the truck to the plant on the following morning, but was prevented from doing so by the accident.

As a result of the accident, plaintiff's truck was a total loss and was damaged in the amount of $1,113.60. Notice of the accident and proof of loss were seasonably given to defendant and defendant has refused payment thereof.

It is further agreed that if the court be of the opinion that plaintiff is entitled to be indemnified for his loss under the terms of the insurance policy, judgment shall be entered in the sum of $1,113.60, and that if the court be of the opinion that plaintiff's loss was not sustained through any fraudulent or dishonest act committed by an employe while in the regular service of plaintiff in the ordinary course of plaintiff's business during the term of the policy, then judgment should be entered for defendant, the costs to follow judgment.

We are called upon to construe the following words in the policy: "Any Fraudulent or Dishonest Act."

Counsel have stated in the briefs that there is no case in Pennsylvania on the precise facts, which are here involved.

I. Defendant contends that the act of the employe as described in the agreed statement of facts was neither fraudulent nor dishonest.

In construing provisions in fidelity policies somewhat similar to what is in the policy now before us, the courts have held that mere negligence or violation of instructions or various kinds of unauthorized acts do not amount to fraud or dishonesty.

In Universal Credit Company v. United States Guarantee Co., 321 Pa. 209, where the insurance company contracted to pay the insured "all direct pecuniary losses sustained by the latter through *'any act or acts of fraud, dishonesty, larceny, embezzlement, forgery or wrongful extraction'* " (italics supplied), and where the insured was engaged in the business of financing automobiles, an employe, Gregory, was charged with the duty of checking the cars at the dealer's place of business and to certify 'I have personally seen and checked the auto numbers on the cars listed above, and certify that the information given is correct', and it appeared that Gregory relied on the dealer for his information and did not personally check the cars, the court at page 211 said:

"The theory of appellant's case here is that the bond covered 'legal' fraud and that, therefore, the court below should have directed a verdict for the appellant since the undisputed documentary evidence (reports submitted by Gregory) showed a false statement by Gregory in that he asserted that he had seen and checked the cars when, in fact, he had not done so. Obviously, if appellant is correct, it was entitled to a verdict and judgment.

"The construction of the language quoted above presents a novel question in this jurisdiction. In other states it has been held that fraud and dishonesty are not shown as a matter of law by the fact that an employee pays out funds in violation of his instructions: World Exchange Bank v. Commercial Casualty Co., 251 N. Y. 1; nor by the fact that a bank official lends bank funds contrary to orders: Parker v. Sprague, 193

N. W. 338. A failure to prevent a theft (Sally v. Indemnity Co., 133 S. C. 342) and an unauthorized sale of goods on credit (American Surety Co. v. Gracie, 252 S. W. 263) have similarly been held not within the coverage of the bond. In Humberg Cheese Co. v. Fristod, 208 Wis. 283, it was stated: 'It seems too clear to require citation of authority to support it that negligence is not fraud, and acts resulting from mistake of judgment are not acts of fraud or dishonesty any more than acts done negligently.' "

Both parties to this case have quoted and relied upon an explanation of the word "dishonesty" by Justice Cardozo, which was given in World Exchange Bank v. Commercial Casualty Company, supra, while Mr. Justice Cardozo was chief justice of the Court of Appeals of New York. This language is as follows:

"Dishonesty, unlike embezzlement or larceny, is not a term of art. . . . The measure of its meaning is not the standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonesty in the common speech of man."

The opinion in Universal Credit Company v. United States Guarantee Company, supra, then continues (p. 211):

"We must be guided by the terms of the bond itself (Equitable Trust Co. v. National Surety Co., 214 Pa. 159) and, construing the clause in question, the acts of *dishonesty and fraud which come within the meaning here disclosed are acts done for the purpose of harm or with a view to personal profit.*" (Italics supplied.)

The court approved of the charge of the lower court in submitting the case to the jury as follows (p. 210):

". . . that while the terms 'fraud and dishonest' as used in the bond embraced acts not necessarily criminal in nature, there must, nevertheless, be a showing of a design or intent upon Gregory's part *to circumvent his employer by cunning or deception* in order

that his acts might constitute fraud and dishonesty under the terms of the bond, and that mere carelessness, laziness or neglect would not entitle plaintiff to recover." (Italics supplied.)

In Wells Corporation v. Aetna Casualty & Surety Co., 98 Pa. Superior Ct. 523, the court had occasion to interpret the words "fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, misappropriation or any other dishonest or criminal act committed by the employee directly or in connivance with others". The employer in this case conducted two separate and distinct lines of business, a restaurant and selling automobiles. It was held by the court that the application for the bond and the terms of the bond itself were intended to cover the operations of the restaurant and not the operations of the automobile business. The default of the employe had relation to the automobile end of the business, but in dealing with the situation, the court at page 530 made this statement:

"If the bond had been given to secure the fidelity of Conner, or if the car had been furnished for any use or purpose in connection with the operation of the restaurant, we would have a different case."

In Miners Savings Bank of Pittston v. Royal Indemnity Company, 336 Pa. 428, the bond insured plaintiff against loss due to "a dishonest or criminal act" on the part of its officers or employes. It was charged that an employe, Sharkey, had misappropriated $950 of the bank's fund, but the insurance company defended on the ground that plaintiff's officers had knowledge of this misappropriation and did not report it to defendant at the time. Since there was evidence to sustain the defense, the jury found for defendant, but the court in discussing the nature of the act of the employe Sharkey and, after reviewing the evidence, said at page 430:

"In the light of this evidence the jury was justified in finding that his conduct was dishonest, if not actually criminal within the language of the bond. The coverage of the bond extends beyond acts which are strictly criminal in nature. The extent of the indemnity provided in bonds containing similar provisions has recently been considered by us. It is sufficient to say that they protect the insured against any acts of its employees involving moral turpitude or want of integrity or any act done with the intent to defraud the insured for the personal profit of the employee: Universal Credit Co. v. United States Guarantee Co., 321 Pa. 209, 183 A. 806; Erie Trust Co. Bank v. Employers' Liability Assur. Corp., 322 Pa. 132, 185 A. 224. There was evidence from which the jury could find that Sharkey's conduct involved a direct attempt to defraud the bank of $950, and that he endeavored to cover his embezzlement by giving his worthless note. The fact that the note was subsequently endorsed by his father does not change the primary dishonesty of his act. Such conduct would involve a default within the terms of the bond. The case was properly submitted to the jury."

In the statement of facts it is agreed that the employe went on a mission of his own and while engaged in a clandestine operation of the employer's truck became involved in a wreck as a result of which the truck was totally destroyed. This was something more than negligence; it was something more than violation of instructions; it was something more than carelessness and it was an act, which was carried out for the purpose or advantage of the employe and not in any respect in the master's interest. It must be regarded as a willful violation of the terms of employment, and as we interpret the act, it was not merely dishonest but was also a crime. The Vehicle Code of May 1, 1929,

P. L. 905, as amended by the Act of 1939, sec. 620, provides that it shall be unlawful for any person to commit any of the following acts:

"(e) To make use or operate any tractor or motor vehicle without the knowledge and consent of the owner or custodian thereof."

The admitted facts, therefore, concede that the employe committed an act which is a crime and which is punishable by fine and imprisonment. We do not think that there is anything in the statement of facts which estops plaintiff from claiming reimbursement under the terms of his policy such as was present in Miners Savings Bank of Pittston v. Royal Indemnity Company, supra.

II. It is the contention of defendant that even if it be determined by us that the act of the employe was either fraudulent or dishonest that, nevertheless, the insurance company is not bound, because the act of the employe was not in furtherance of the master's business.

Defendant contends that the well-known principle of agency, which had its origin in England back in the "horse and buggy days", is applicable to a policy of insurance such as we now have before us. It is true that the English courts used a very apt phrase in describing a situation of this kind. They held that a master was not responsible for the acts of a servant committed *"when he was on a frolic of his own"*.

It must be conceded under the agreed statement of facts that the employe in our present case, when operating his employer's truck without the employer's consent or knowledge and for his own purposes at 3:30 a.m. on the Brownsville Road, was engaged on a frolic of his own. But, it does not seem to us that this principle of agency has an application to our present situation.

It was intended by that principle to protect the master where his servant went altogether outside the scope of employment and while in possession of the master's vehicle occasioned damage to someone else. The reason of the rule, which was there applied, would not, we think, apply to a case where the master was insured against loss to his property and the willful and disobedient servant brought about the destruction of the property while engaged generally in the master's employment, but outside the specific scope of his employment.

The reason lying at the basis of the agency rule was the protection of the employer and not to penalize him because of a willful and dishonest act of his servant.

If we are correct in the views, which we have above expressed, judgment should be given for plaintiff in the amount claimed and it will be so ordered.