# Edmunds-Bouvier Savings and Loan Assn. v. New Amsterdam Casualty Co.

**230**

*A. Walling Levin*, for plaintiff.

*Raymond A. White, Jr.* and *E. Walter Helm, 3rd*, for defendant.

FLOOD, J. September 28, 1956.—This is a suit on a fidelity bond. Plaintiff, alleging defalcations by an employe, Benjamin Vetrone, Jr., originally sought to recover $36,076.09 as the amount actually taken, costs of certain official examinations occasioned by Vetrone's acts and interest on each claim. Defendant admitted that $23,105.42 of the $36,076.09 item was due and paid that amount to plaintiff with interest. Defendant denies its liability for the remainder of plaintiff's claims.

With regard to the first item, we are satisfied that the total amount of Vetrone's embezzlement was $36,076.09, not $23,105.42. After plaintiff, in 1953, duly notified supervisory authorities of its shortage, both the Pennsylvania Department of Banking and the Federal Home Loan Bank Board ordered their examiners to investigate the matter. Vetrone took these examiners to the cellar of plaintiff's building, produced 113 subsidiary ledger cards hidden there and stated, "These are the cards that represent my shortage." These cards reflected liabilities totaling $36,076.09. It was established at trial that these cards accurately reflected the amounts of 113 existing accounts. The testimony of Vetrone and the examiners

clearly established that Vetrone's basic method of concealing his peculations was to abstract subsidiary ledger cards of various accounts which covered the amount of his shortage to date. When he embezzled additional funds, he then would remove and conceal additional cards or substitute other cards for those which he then held, but the total of the cards held by him at any time usually remained equivalent to the amount of his total theft to that date

The exhaustive examination of plaintiff's books for the period September 4, 1953, to July 1, 1951, confirmed Vetrone's testimony as to his method of concealing his thefts and demonstrated that the amount of plaintiff's shortage during this time corresponded to the total of the ledger cards abstrated between these dates The examination further established that the total of the four cards held by Vetrone on November 17, 1950, exactly corresponded with plaintiff's shortage as of that time $12,970.67

This documentary evidence, without more, might be insufficient proof that Vetrone had embezzled prior to November 17, 1950, and that the amount which he had taken was $12,970.67. However, the pattern which it establishes powerfully reinforces both Vetrone's confession at trial and the testimony of his admissions to the examiners. Defendant's main attack on plaintiff's proof was the suggestion on cross-examination that since Vetrone had made some fictitious entries in the books, all or part of the $12,970.67. item might represent purely fictitious liability. We see no reason to accept this unverified suggestion or because of it to reject the evidence of Vetrone's confession and the documentary evidence which convince us that this item of loss resulted from Vetrone's embezzlements.

Defendant chiefly contends, however, that even if plaintiff proved this loss at trial, it cannot recover under the bond since it failed to comply with its re-

quirements that plaintiff furnish defendant with "proof of loss with full particulars." The proof filed by plaintiff stated in regard to this item:

"Optional bank subsidiary ledger cards 'held out' by Mr. Vetrone as of November 17, 1950 (see Comment 3-A) (No examination procedures have been conducted to cover period prior to July 1951) . . . $12,970.67."

Defendant maintains that since the information in the proof of claim consisted of circumstantial evidence and was subject to certain possible objections, plaintiff failed to supply it with "full particulars" which would allay such doubts. Actually, at the time this proof of loss was filed the information furnished by plaintiff was all that it had with regard to this portion of its loss. The examiners had not made a detailed investigation prior to July 1, 1951. They testified that it was not thought worth the cost to make a detailed verification of the remaining shortage of $12,970.67. They estimated that to do so might cost again as much as the detailed examination which they had conducted. The cost of that investigation was $6,766.95. It is to be noted that: (1) The examiners stated that Vetrone had confessed as to this item; (2) the cards outstanding on November 17, 1950, were identical with the amount of the shortage; and (3) the circumstances indicated that the same method of deception was used as in the later peculations.

Was there then sufficient "proof of loss with full particulars" when plaintiff provided defendant with such information as it possessed and clearly identified the item for which the claim was made? There is scant judicial consideration of the phrase "full particulars" in fidelity bonds. See Fitchburg Savings Bank v. Mass. Bonding & Insurance Co., 274 Mass. 135, 174 N. E. 324 (1931) ; Hartford Accident & Indemnity Co. v. Kenny, 44 Ohio App. 138, 184 N. E. 695 (1932).

Couch states that the phrase contemplates "sufficient of the particulars to enable the insurer intelligently to prosecute such inquiry, and not all the details of the event . . .": 7 Couch, Cyclopedia of Insurance Law §1545 (1930). We only can conclude that it means that the insured should give the insurer all of the important facts relating to the event that it possesses. This it has done here in view of the evidence.

We cannot accept defendant's contention that "full particulars" requires a search for information which the insured does not possess. The bond provision construed as defendant wishes would require plaintiff to present the insurer proof sufficient to sustain its position at trial. The courts have said that a bond provision requiring "proof of loss" does not impose so demanding a standard. Such a clause requires "not . . . that full, clear and explicit proof, . . . required upon the trial . . . but . . . such reasonable evidence as the party can command at the time, to give assurance that the event has happened": Fitchburg Savings Bank v. Mass. Bonding & Insurance Co., 274 Mass. 135, 152, 174 N. E. 324, 329 (1931); Hartford Accident & Indemnity Co. v. Kenny, 44 Ohio App. 138, 145, 184 N. E. 695, 697 (1932); O'Reilly v. Guardian Mutual Life Insurance Co., 60 N. Y. 169, 173 (1875).

We cannot see how the addition of a "full particulars" provision changes this standard of proof under the policy. The purpose of the "full particulars" clause, it seems clear, is to secure for the insurer such information as the insured has so that the insurer's own investigation may be facilitated should it wish to satisfy itself that there is liability under its bond. It received such information here.

In our opinion, therefore, plaintiff is entitled to recover the item of $12,970.67. It also is entitled to recover interest on the full amount due at the legal rate and computed from the respective dates of defalcation:

Erie Trust Co. Bank v. Employers' Liability Assurance Corp., 322 Pa. 132 (1936).

With regard to the cost of the State and Federal examinations, the bond promises indemnification from: "Any loss through any dishonest, fraudulent or criminal act of any employee . . . including loss of Property by reason of any such act of any such Employee. . . ." We see only three problems on this head: (1) Should the rule ejusdem generis restrict recovery to losses of property and exclude items of consequential loss? We think not. The clause which relates to property loss is introduced by the word "including" which suggests that recoverable claims are not limited to those based on loss of property. "Property" is defined at length to include money and the numerous other items of personalty likely to be embezzled or stolen. Therefore, the bond suggests that "losses" may include items of damage other than those which represent the value of what the thief or embezzler himself took.

(2) Is this claim, nevertheless, so remote that the contracting parties could not have intended that it be recoverable as a "loss"? Again we think not. Certainly the loss provision does not comprehend a recovery of every expenditure occasioned by a dishonest act, e. g., plaintiff's attorney fees in this case. The claim here involved, however, represents the cost of restoring to plaintiff's business records the integrity which Vetrone's manipulations destroyed. This likely consequence of an employe's fraud itself is so serious for the employer that the contracting parties might well have contemplated the recovery of reasonable audit costs under the "loss" provision. In this view we are supported by a New York trial court case: Ninth Federal Savings and Loan Ass'n v. U. S. Fidelity & Guaranty Co., 50 N. Y. S. 2d 372 (Supreme Ct. 1944).

(3) Even if the bond restricts recovery to claims for loss of propetry, is not this statutory liability to pay the costs of supervisory examinations a "property loss"? We think so since "property" is defined to include money: Hooker v. New Amsterdam Casualty Co., 33 F. Supp. 672 (W. D. Ky. 1940).

It might be mentioned that defendant objected at the trial to the admission of the testimony of Vetrone, arguing that it was not bound by his declarations. We need say no more than that these admissions by Vetrone himself at the trial were not hearsay declarations but admissible testimony by himself as to his own actions.

### Findings of Fact.

1. Benjamin J. Vetrone, Jr., was first employed by plaintiff's predecessor in January of 1947.

2. He started to steal moneys from the association at the end of 1948 or beginning of 1949 and his thefts were relatively continuous thereafter.

3. He used a regular system to cover up his cash abstractions, to wit, he would abstract from the association's records, and hide, subsidiary ledger cards with balances equal to the amount of cash he stole, so that the books of the association would always be in apparent balance and the cash shortage would not be discovered, and he would generally have out and concealed cards which totaled the amount of his maniplations up to any particular point.

4. Between the end of 1948 and November 17, 1950, Benjamin J. Vetrone, Jr., stole a total of $12,970.67 from the association and on November 17, 1950, the association's assets were short in the said sum.

5. In order to conceal his theft of the said sum Vetrone abstracted and hid four ledger cards which are in evidence as plaintiff's exhibit 8. These cards total exactly $12,970.67.

6. These cards represent actual bona fide liabilities of the association.

7. Vetrone from time to time substituted other cards for the original cards which he abstracted when he took the cash.

8. When his defalcations were discovered in September of 1953, Vetrone took the Federal and State examiners downs to the association's basement to an old file where he showed them he had hidden 13 ledger cards totaling $36,076.09 and turned the cards over to them stating that they represented the amount of his shortage.

9. These cards represented bona fide liabilities of the association.

10. Of the total of $36,076.09 represented by these 13 cards $12,970.67 of that sum were represented by cards which had been substituted for the original cards in that sum missing on November 17, 1950.

11. Between November 17, 1950, and September 1953, admittedly Vetrone stole a total of $23,105.42 from plaintiff and during that period the total of missing ledger cards wrongfully abstracted from the association's records increased by this exact amount to wit, from $12,970.67 to $36,076.09.

12. Eight Federal and State examiners spent three and one half months at a cost of $6,766.95 to check out the manipulations of Vetrone covering a two and one quarter years periods backwards from September of 1953 to July 1, 1951, confirming his thefts and method of operation as set forth in their final report.

13. The director of the Building and Loan Board of the Commonwealth of Pennsylvania and the Chief Examiner of the Federal Home Loan Bank and the expert examiners of these respective departments at that point decided as qualified experts that they had determined the total amount of defalcations and that Vetrone was responsible for all of them and that any

further detailed check would merely increase expenses unnecessarily and was not practical.

14. Defendant's requests for findings are refused. We conclude that plaintiff is entitled to recover: (1) The amount of the shortage not already paid by defendant, $12,970.67, together with interest thereon from November 17, 1950; (2) the cost of the Department of Banking examination, $3,219.45, together with interest thereon from January 8, 1954, the date when this item was paid by plaintiff; (3) the cost of the Home Loan Board examination, $3,547.40, together with interest thereon from December 30, 1953, the date when this item was paid by plaintiff; and (4) the deficiency of interest in the amount of $1,076.24 due on the $23,105.42 shortage paid by defendant to plaintiff.

*Finding*

The court finds for plaintiff in the sum of $26,277.49.