Erie Trust Company Bank *v.* Employers' Liability Assurance Corporation of London, Ltd., Appellant.

Argued March 23, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*William T. Campbell,* of *Swartz, Campbell & Henry,* with him *Orson J. Graham* and *Gunnison, Fish, Gifford & Chapin,* for appellant.

*Frank B. Quinn,* of *English, Quinn, Leemhuis & Tayntor,* for appellee.

OPINION BY MR. JUSTICE STERN, May 25, 1936:

Defendant issued to plaintiff bank a bond insuring the latter against "any loss through any dishonest or criminal act of any of the Employees." Andrew J. Ignasiak, who was a teller in the bank, committed various acts of defalcation with a consequent loss to plaintiff of $20,-717.20. The defense to the present action to recover this loss was based on section 11 of the bond, which provides that: "This bond shall terminate as to any Employee— (a) as soon as the Insured shall learn of any default hereunder committed by such Employee. . . ." Defendant contended that Ignasiak committed acts of "default" on March 4, 1931, which became known to plaintiff on March 5, 1931, and that therefore the bond terminated on the latter date. If this were so, there could be no recovery by plaintiff, for not only would the bond not have been in effect so as to cover defalcations of Ignasiak subsequent to March 5, 1931, but the bond by its terms insured against only the losses "discovered by the Insured . . . prior to the expiration of twelve months after the termination of this bond as provided in section 11 hereof," and in the present case, although there were losses sustained by reason of defalcations of Ignasiak before March 5, 1931, they were not discovered until October 19, 1932.

What happened on March 4, 1931, was that Ignasiak after business hours cashed a check for his brother in the sum of $1,520, knowing that his brother did not have sufficient funds in the Lincoln Bank, upon which the check was drawn, to meet it if it were presented the next day. Ignasiak claimed, however, that his brother promised him he would deposit sufficient funds to make the check good, and as a matter of fact, on March 5, the brother did make such deposit and no loss was actually sustained by plaintiff bank. On the same day, March

4, also after business hours, Ignasiak cashed a check for one Spector in the sum of $500. The check was dated March 7, but when the matter was brought to his attention Ignasiak claimed that when he cashed it he had not noticed it was postdated. In regard to this check also plaintiff bank suffered no loss because, before March 7, sufficient funds were deposited to meet the check.

In the case of both of these transactions the checks were carried by Ignasiak on the teller's sheets as cash. It happened that on March 5, representatives of the state banking department made their periodic examination of the affairs of the bank, discovered what had occurred, and called the matter to the attention of the president of the bank. Ignasiak was called into conference and gave his explanation of the transactions. The bank's officers and directors, after thorough consideration, and having in mind the fact that Ignasiak had been in the employ of the bank for several years and had given apparently satisfactory service, came to the conclusion that, while the transactions may have been irregular and showed a lack of judgment on Ignasiak's part, nevertheless he had no corrupt motive and had not intended to do anything criminal or morally wrong. They did remove him from the teller's cage and gave him a position in another department.

On October 19, 1932, plaintiff bank discovered that Ignasiak had committed various acts of defalcation and embezzlement covering a period dating as far back as the year 1930; they gave prompt notice thereof to defendant and demanded indemnity under the bond.

The word "default" in section 11 of the bond is obviously used as synonymous with a "dishonest or criminal act," such act being the "default" against which the bond insured. In the affidavit of defense, defendant constantly uses these terms as interchangeable. The question involved therefore is whether the acts of Ignasiak on March 4, 1931, were "dishonest" or "criminal." That question was submitted by the learned trial judge to the

jury to be determined as an issue of fact under all the evidence in the case. Defendant contends that the court should have declared the transactions dishonest or criminal as a matter of law, and should have given binding instructions for defendant. The question, however, was one exclusively within the province of the jury. An act may be criminal or otherwise according to the intent with which it is performed, and for an act to be "dishonest" there must exist the element of moral turpitude or want of integrity. If, for example, when Ignasiak cashed his brother's check, he had no real belief that the necessary funds would be deposited and was deliberately handing over to his brother moneys of the bank with the intent to defraud it, the act would be both dishonest and criminal; but if, on the other hand, he entertained an honest belief that the check would be made good, and he was merely attempting to accommodate his brother by cashing it, just as he might have done in the case of any other person deemed to be a responsible party, the transaction, even though unauthorized, could scarcely be characterized as being either criminal or dishonest. The same observations apply to the Spector transaction, especially if, as Ignasiak contended, he had negligently failed to observe that the check was postdated. It was for the jury to pass upon all the attendant facts and circumstances, and their finding in the matter is conclusive. This question has been so recently and fully discussed by the present Chief Justice in the somewhat similar case of *Universal Credit Co. v. United States Guarantee Co.*, 321 Pa. 209, that nothing profitable can here be added.

Although not assigned as an error in its rule in the court below for a new trial, defendant now contends that the learned trial judge should not have allowed the bank examiners to testify that, according to banking usage, there was nothing improper in a teller's cashing checks after the close of banking hours or in carrying them as cash until they were cleared in the regular order

of business, and that such transactions would not be viewed, in general banking practice, as dishonest or even as irregular. Defendant argues that this was not a question upon which expert testimony should have been admitted. The witnesses, however, did not purport to express their own opinions as to the transactions, but merely as to the status and significance which such acts had in the banking world. Evidence is frequently received in regard to the usage and customs of a business in which the witness is engaged or with which he is familiar, where a jury cannot be expected to have the necessary technical knowledge or experience to appraise the nature of a transaction performed in the course of such business.

The point is raised by defendant that it was not proper for the court below to allow interest on plaintiff's claim from the times when the various defalcations occurred, but that the interest should have been computed only from the date when demand for payment was made by plaintiff. This question has been discussed in several Pennsylvania cases. In *Pennsylvania Co. v. Swain*, 189 Pa. 626, and in *Folz v. Tradesmen's Trust & Saving Fund Co.*, 201 Pa. 583, it was held that a surety on a bond was responsible for interest only from the time when demand was made upon the surety. In *Herron v. Stevenson*, 259 Pa. 354, interest was allowed from the date of the principal's default, and the *Swain* and *Folz* cases were distinguished as having arisen on official bonds. In *Commonwealth v. Great American Indemnity Co.*, 312 Pa. 183, it was suggested that the same two cases might be distinguished on the ground that in them the claim upon the surety exceeded the penal sum of the bond, and, after a review of the Pennsylvania authorities, the conclusion was reached that, in the absence of a stipulation in the contract to the contrary, the surety of a defaulting principal is liable for interest from the time that the principal becomes liable therefor. In *Punxsutawney Boro. v. Mitchell (No. 1)*, 320 Pa. 168,

interest was allowed only from the time of the beginning of the suit against the surety, but that was the case of an official bond covering the liability of a borough treasurer. In other jurisdictions the general weight of authority seems to be in favor of holding the surety liable for interest from the time when the defalcation by the principal occurs, if such liability does not cause the claim to exceed the penal sum of the bond. Clearly, in a bond such as that in the present case, insuring against losses, the insured should be allowed the same measure of reimbursement from the insurer as it could have obtained in an action against the defaulting principal, and such recovery would certainly include interest from the time of the defalcation: *Guarantee Co. of North America v. Mechanics' Savings Bank & Trust Co.,* 80 Fed. Rep. 766. The court below, therefore, was not in error in allowing interest accordingly.

Judgment affirmed.