THE MORTGAGE CORPORATION OF NEW JERSEY, A BODY CORPORATE, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. THE AETNA CASUALTY & SURETY COMPANY, LIKEWISE A BODY CORPORATE, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

Argued March 28, 1955—Decided June 20, 1955.

See also 19 *N. J.* 24, 115 *A.* 2*d* 58.

32

*Mr. Charles W. Broadhurst* argued the cause for the appellant and cross-respondent (*Messrs. Emory, Langan & Lamb,* attorneys).

*Mr. Theodore McCurdy Marsh* argued the cause for the respondent and cross-appellant (*Messrs. Riker, Emery & Danzig,* attorneys; *Mr. Everett M. Scherer,* of counsel).

The opinion of the court was delivered by

JACOBS, J.  The defendant Surety Company issued a "Brokers Blanket Bond" which undertook to indemnify and hold harmless the plaintiff Mortgage Corporation against losses described as follows: *"Fidelity* (A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of property through any such act of any of the Employees." The plaintiff's complaint in the Law Division alleged that it had suffered substantial losses through the dishonesty of its employee Harrison and sought recovery on the bond. After two trials, resulting in jury verdicts for the defendant, Judge Colie entered judgment for the plaintiff which is before us for review.

The plaintiff is in the construction loan business and agreed to lend money to Closter Village, Inc. which was engaged

in building dwelling houses. The arrangement between them was that partial payments would be made by the plaintiff as work on the houses proceeded, to wit: 20% when "the slab was completed"; 15% when the building was "rough enclosed"; 20% when the building was enclosed with complete roof and "protected against the weather" with "wiring in rough form"; 25% when the "white coat of plaster was completed"; 10% when the building was "substantially completed"; and the balance of 10% when the house was sold and the "purchaser took title." Harrison was employed by the plaintiff to inspect the progress of the work and to make certifications on the basis of which his employer would make the disbursements to the borrower, Closter Village, Inc. There was no dispute as to the terms of his employment. He testified that when he was employed as inspector for the plaintiff he was given instructions as to his duties and that his responsibility was to "personally inspect" the houses and certify to his employer at each of the stages of construction so that his employer, in reliance thereon, could make the payments then called for by its arrangement with the borrower. The formal certifications were on check requisitions and disbursement memoranda supplied by the plaintiff and filled in and signed by Harrison; there can be no dispute that these were intended to, and in effect were taken to, embody Harrison's representations that he had made the personal inspections required and that on the basis thereof he was certifying that the work or stage of construction described as completed had in fact been completed.

Until early in 1951 Harrison did his work faithfully; he made his personal inspections in regular course and his certifications on the basis thereof were presumably accurate. However, between January and May 1951 he made 92 false certifications; in all of these instances he made his certifications without any personal inspections whatever; in some he certified that the houses were complete when only the foundation slab had been laid; in others he certified that the houses were complete though there had been no construction whatever. None of the foregoing is in dispute and

Harrison's own testimony conceded his derelictions. He stated, however, that he made no profit and intended no harm thereby. His testimony was that a severe storm in February 1951 increased his work and made his personal visits to the houses exceedingly difficult and that he, accordingly, relied in good faith upon Mr. Sands, an employee of Closter Village, Inc., for his information in lieu of personal inspections. Harrison's certifications were accompanied by Veterans Administration inspection certificates relating to the early stages of construction, though Harrison's reliance was not on these but on Sands who was then reputedly trustworthy. Harrison admitted that he never asked permission to eliminate his personal inspections and never reported to any of his superiors that he had done so. When he was asked by Judge Colie whether he thought the personal inspections to be of no importance he said "far from it" and that, to the contrary, he realized their importance because his employer was "paying out money." He reiterated his position that he trusted Sands "and worked with him so long and felt that the houses" were proceeding smoothly. In response to Judge Colie's final inquiry as to whether he did not consider it his obligation to report to his employer that he was not making personal inspections he said, "No, sir. I was afraid I would lose my job." · That the plaintiff actually relied on Harrison's certifications and incurred substantial losses because of their admitted falsity is not disputed.

At the first trial the jury returned a verdict of no cause for action. In setting it aside, Judge Ewart stated that he could not escape the conclusion that "Harrison was guilty of dishonest acts knowing them to be dishonest and extending over a period from three to four months, and that as the direct result of his derelictions his employer was caused to suffer the loss of a large sum of money"; he expressed the view that reasonable minds could reach no other conclusion. At the second trial the plaintiff's motion for direction of judgment was denied and the jury again returned a verdict of no cause for action. The plaintiff then moved for judgment notwithstanding the verdict or a new trial. Judge

Colie granted the motion for final judgment in the plaintiff's favor and in his oral conclusions pointed out that the evidence was "uncontradicted and unchallenged in any way" and established that Harrison was "dishonest" within the contemplation of the bond coverage; he expressed the view "that the law in New Jersey is that where an employee, as in this case, is employed to perform a series of acts and to certify a set of facts on physical inspections, and that employee certifies to those facts, without having made the physical inspection, that then, intent to harm his employer becomes an irresistible inference, from that course of conduct having been pursued over a long period of time with the employee's full knowledge, that he is unfaithful to his employer; that he further lacks integrity and that brings him squarely within the definition of 'dishonest,' as it is stated in all of the standard dictionaries that I have examined and I have examined a number."

It is generally recognized that fidelity bonds indemnifying employers against dishonest acts of their employees are to be broadly construed. 9 *Appleman, Insurance Law and Practice,* 566 (1943); 5 *Couch, Cyclopedia of Insurance Law,* 4353 (1929). *Cf. Schneider v. New Amsterdam Cas. Co.,* 22 *N. J. Super.* 238, 242 (*App. Div.* 1952). Here its comprehensive title, "Brokers Blanket Bond," and its wide coverage of "Fidelity" losses through "dishonest, fraudulent or criminal" acts of employees, evidence the clear intent to protect the employer against employees' wrongful acts which, though not criminal, nevertheless display significant lack of probity, integrity or trustworthiness. See *Exeter Banking Co. v. Taylor,* 85 *N. H.* 458, 160 *A.* 733, 735 (*Sup. Ct.* 1932), where the court aptly remarked that the words fraud and dishonesty as used in indemnity bonds "are broadly interpreted to include any acts which show a want of integrity or a breach of trust," and *Citizens' Trust & Guaranty Co. of West Virginia v. Globe & Rutgers Fire Ins. Co.,* 229 *F.* 326, 330 (*4th Cir.* 1915), where Judge Woods noted that these terms extend beyond acts which would be criminal (*cf. Report of the Committee on the Revision of the Law of Evidence*

to the *Supreme Court of New Jersey*, 44 (1955)) and are
"to be given a broad signification and taken most strongly
against the surety company." See also *Note, Act or Default
of Employee Covered by Fidelity Bond or Insurance*, 77
*A. L. R.* 861, 863 (1932), 98 *A. L. R.* 1264, 1266 (1935).
The absence of any motive of personal profit or gain does not
establish that the wrongful act of the employee was not dis-
honest; see *United States Fidelity & Guaranty Co. v. Egg
Shippers' S. & F. Co.*, 148 *F.* 353, 355 (8th Cir. 1906),
where the court, in characterizing an employee's conduct as
dishonest within the meaning of a fidelity bond, said:

"The test is not whether he intended to personally profit by his
course, though that he did is perhaps a permissible inference from
the facts shown. He occupied a position of trust and confidence
which he secretly betrayed. He received compensation for guarding
the interests of his employer and he was willfully, intentionally, and
grossly faithless."

But it is true that evidence of mere neglect or incompetence
would not bring the matter within the coverage of a bond
indemnifying against dishonest acts of employees; see *Irvin
Jacobs & Co. v. Fidelity & Deposit Co. of Md.*, 202 *F.* 2d
794, 798, 37 *A. L. R.* 2d 889 (7th Cir. 1953), where the
court, after reaffirming the doctrines that indemnity bonds
are to be liberally construed and that there need be no show-
ing that the "employee personally profited by his acts," said:

"However, mere negligence, mistake, or error in judgment would
not ordinarily be considered a dishonest act. Acts resulting from
incompetence cannot be characterized as dishonest."

In the oft-cited case of *World Exchange Bank v.
Commercial Casualty Ins. Co.*, 255 *N. Y.* 1, 173 *N. E.* 902,
903 (1930), a bank teller cashed checks which he believed
to be good; he knew that they were drawn against uncol-
lected items and there was a bank rule prohibiting such
payments without the approval of the president or other
officer. Chief Judge Cardozo, in an opinion delivered for
the New York Court of Appeals, held that the quality of

the teller's act was "not so obvious and determinate as to exclude opposing inferences" and that the question as to whether the teller's conduct was dishonest within the meaning of an indemnity bond was a proper one for jury determination. Many other cases may readily be found in which courts have held that under the particular evidence there presented the issue of whether the employee's act was dishonest within the bond coverage was for the jury to decide. See e. g., *Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Md., supra; Exeter Banking Co. v. Taylor, supra; Hansen v. American Bonding Co. of Baltimore,* 183 *Wash.* 390, 48 *P.* 2d 653 (*Sup. Ct.* 1935); *Universal Credit Co. v. United States Guarantee Co.,* 321 *Pa.* 209, 183 *A.* 806 (*Sup. Ct.* 1936). However, these cases do not question the well settled principle that where the court finds that the facts are uncontroverted and reasonably permit of but a single conclusion it becomes its duty to direct a judgment in accordance with its own interpretation of the bond coverage. See *Brandon v. Holman,* 41 *F.* 2d 586 (4th *Cir.* 1930); *Hall v. Aetna Casualty & Surety Co.,* 89 *F.* 2d 885 (2d *Cir.* 1937), certiorari denied 302 *U. S.* 725, 58 *S. Ct.* 47, 82 *L. Ed.* 560 (1937). *Cf. Cleary v. Meyer Bros.,* 114 *N. J. L.* 120, 124 (*E. & A.* 1935); *I. Hausman & Sons, Inc. v. Central Home Trust Co.,* 118 *N. J. L.* 104, 109 (*E. & A.* 1937); *Esposito v. G. O. K. Enterprises, Inc.,* 137 *N. J. L.* 400, 401 (*Sup. Ct.* 1948). In the *Brandon case, supra* [41 *F.* 2d 588], a very aged cashier of a bank permitted the misuse of bank funds to help a glass company in which he and his family were interested; in sustaining a judgment for the bank against the American Surety Company which had indemnified it against dishonest acts of its employees, the court said:

"It was the duty of the judge below, under the circumstances, to direct a verdict for the plaintiff. The rule laid down by the Supreme Court of the United States is that a verdict should be directed when the evidence given at the trial, with all inferences that the jury could justifiably draw from it, leads to but one conclusion. *Delk v. St. Louis & S. F. R. Co.,* 220 *U. S.* [580] 587, 31 *S. Ct.* 617, 55 *L. Ed.* 590; *A. B. Small Co. v. Lamborn & Co.,* 267 *U. S.* 248, 45 *S. Ct.* 300, 69 *L. Ed.* 597. This court has repeatedly held

to the same effect. *Anderson v. Southern Ry. Co.* (*C. C. A.*) 20 *F.* (2d) 71; *Lamborn v. Woodard* (*C. C. A₂*) 20 *F.* (2d) 635; *Flannagan v. Provident Life & Accident Ins. Co.* (*C. C. A.*) 22 *F.* (2d) 136; *Lyon v. Travelers' Protective Ass'n of America* (*C. C. A.*) 25 *F.* (2d) 596; *Livingston v. Atlantic Coast Line R. Co.* (*C. C. A.*) 28 *F.* (2d) 563; *Standard Oil Co. v. Cates* (*C. C. A.*) 28 *F.* (2d) 718.

The court below properly directed a verdict for the plaintiff, and the judgment is accordingly

Affirmed."

See also the *Hausman* case, *supra,* where the Court of Errors and Appeals in sustaining a judgment entered for the defendant in the plaintiff's action for recovery under a lease, said:

"The rule of law is firmly settled in this court by a long line of cases that the construction and effect of written instruments is a matter of law to be determined by the court and not by the jury, unless construction depends upon extrinsic facts which are in dispute. *Grueber Engineering Co. v. Waldron*, 71 *N. J. L.* 597; *Sommer Faucet Co. v. Commercial Casualty Insurance Co.*, 89 *N. J. L.* 693; *Downs v. New Jersey Fidelity and Plate Glass Insurance Co.*, 91 *N. J. L.* 523; *McLaren v. Marmon-Oldsmobile Co.*, 95 *N. J. L.* 520, 524; *John S. Geiger Sons, Inc., v.* [*Edward M.*] *Waldron, Inc.*, 100 *N. J. L.* 93. Tested by that rule, the court was justified in controlling the jury by a binding instruction directing a verdict in favor of the defendant. *Coyle v. Griffing Iron Co.*, 63 *N. J. L.* 609; *Vandergrift Construction Co. v. Camden, etc., Railway Co.*, 74 *N. J. L.* 669; *Cleary v. Meyer Bros.*, 114 *N. J. L.* 120. We are of the opinion that the proofs would not have supported any other verdict."

Admitted or established thefts by an employee would be considered by all courts to be dishonest within indemnity bond coverage regardless of any heart-rending circumstances which may have induced them; and acknowledgment that the stolen funds were not intended for the employee's personal gain or profit and were intended to be restored without harm to the employer would not be pertinent. The decent administration of justice could not tolerate the spectacle of a jury finding that such thefts were to be deemed not dishonest within indemnity bond provisions; it seems to us that in the instant matter we likewise could not properly stand by and permit the jury finding that the

admitted derelictions of Harrison were not dishonest within the bond coverage. We are not dealing with an instance of neglect, mistake or incompetence; nor are we dealing with an isolated inadvertent or insignificant delinquency by an employee. What Harrison did was done willfully and was continued over a period of four months. On 92 occasions he certified that he had made personal inspections when he knew that such certifications were false and that his employer, being unaware of their falsity, would disburse large sums in reliance thereon. He deliberately failed to tell his employer that he was not making personal inspections because he was afraid he would lose his job; and this though he knew that the very purpose for which he was hired as inspector was to make personal inspections and to issue his certifications on the basis thereof. Under the admitted facts he palpably was faithless to his trust and deceived his employer; it matters not that his conscious deceptions may not have been accompanied by intent to cause actual monetary loss to his employer and may have been induced by motives of personal comfort or convenience rather than personal profit or gain for, in any event, his conduct was morally as well as legally wrongful. In the light of all of the foregoing we are convinced that Harrison's misconduct must fairly be held to be the type of action which fell within the reasonable and proper coverage expectations of the parties to the fidelity bond issued by the defendant to the plaintiff.

No useful purpose would be served by further discussion of the out-of-state cases relied upon by the Surety Company where the courts viewed the particular facts presented to them as permitting differing inferences as to the employee's honesty; as we view the entire record in the instant matter, all of the material evidence was uncontroverted and permitted of but one reasonable conclusion, namely, that Harrison's acts were dishonest within the wide contemplation of the defendant's indemnity agreement. Accordingly, the trial court should have granted the plaintiff's motion for judgment at the close of the taking of testimony; on appeal we may grant the relief that should have been

granted below. See *Miller v. Board of Chosen Freeholders of Hudson County,* 10 *N. J.* 398, 415 (1952); *Jaroszewski v. Central Railroad Co., New Jersey,* 9 *N. J.* 231, 236 (1952); *George Siegler Co. v. Norton,* 8 *N. J.* 374, 385 (1952). In the *Miller* case, *supra,* this court reversed a jury verdict for the plaintiff and entered judgment for the defendant; in the course of his opinion Justice Burling noted that "Where a motion for judgment should have been granted by the trial court and judgment entered for the defendant, the appellate court will reverse the judgment entered for the plaintiff, and enter judgment for the defendant." *Cf. R. R.* 1:9–1(*b*); *R. R.* 1:5–4; *Const.* 1947, *Art.* VI, § V, *par.* 3. In the *Jaroszewski* case, *supra,* this court found that negligence could not reasonably be inferred from the evidence and entered judgment for the defendant notwithstanding a jury verdict to the contrary, and in the *Siegler* case, *supra,* a judgment for plaintiff was reversed and a judgment for defendant was entered in this court on the finding that the only reasonable conclusion to be drawn from the evidence was that the plaintiff was guilty of contributory negligence. See *Kagan v. Berman,* 14 *N. J.* 467, 474 (1954); *Trustees First Presbyterian Church in Newark v. Howard Co.-Jewelers,* 22 *N. J. Super.* 494, 503 (*App. Div.* 1952), affirmed 12 *N. J.* 410 (1953). *Cf. United States Fidelity and Guaranty Co. v. Davis,* 12 *N. J.* 365, 367 (1953).

The Surety Company questions the procedural propriety of the trial court's action in entering final judgment notwithstanding the jury's contrary verdict and points out that unlike the *Federal Rules of Civil Procedure* (*Rule* 50(*b*)) our rules have not thus far embodied any express authority therefor. See *Clapp, Federal Rules and New Jersey Practice,* 16 *F. R. D.* 39, 65 (1954); *Schnitzer, Civil Practice and Procedure,* 8 *Rutgers L. Rev.* 272, 287 (1953). *Cf. Rospond v. Decker,* 109 *N. J. L.* 458 (*E. & A.* 1932); *Dorman v. Usbe B. & L. Assn.,* 115 *N. J. L.* 337 (*Sup. Ct.* 1935). See also 5 *Moore's Federal Practice* (2d ed. 1951), 2325; *Carlin, Judgment Non Obstante Veredicto,* 51 *W. Va. L. Quar.* 14 (1948); *Orfield, Judgment Notwithstanding the Verdict in*

*Federal Criminal Cases,* 16 *U. of Pitt. L. Rev.* 101 (1955);
and Notes in 40 *Ky. L. J.* 113 (1951); 4 *Okla. L. Rev.* 510
(1951); 97 *L. Ed.* 90 (1952). However, we need not deal
with the matter since, under the enlightened practice ap-
proved in the *Miller, Jaroszewski* and *Siegler* cases, *supra,*
final judgment may justly be entered here. The amount
payable under the bond is not in dispute and there is no
suggestion that a third trial would produce any different
evidence. *Cf. United States Fidelity and Guaranty Co. v.
Davis, supra; Lambert v. M. Satsky Trucking Co.,* 120
*N. J. L.* 391, 392 *(Sup. Ct.* 1938).

Judgment for the plaintiff will be entered in this court,
in accordance with the final judgment in the Law Division,
in the sum of $88,253.40 with costs and interest from
October 30, 1954.

HEHER, J. (dissenting). By a "Broker's Blanket Bond"
issued October 4, 1949, the defendant insurer undertook and
agreed to indemnify and hold the plaintiff harmless, to an
amount not exceeding $75,000, "from and against  \*  \*  \*
Any loss through any dishonest, fraudulent or criminal act
of any of the Employees, committed anywhere and whether
committed alone or in collusion with others, including loss
of property through any such act of any of the Employees";
and the cause of action pleaded here is loss allegedly sus-
tained by the plaintiff indemnitee through the "dishonest,
deceitful and fraudulent acts" of one Harrison, an employee
within the fidelity coverage thus provided.

The claimed loss was suffered in this wise: In the pursuit
of its business of lending money for large-scale construction
of one-family residences on first-mortgage security, plaintiff
agreed to loan $625,000 to Closter Village, Inc., secured by
a mortgage dated November 15, 1950 covering lands in the
Borough of Closter to be developed for houses of the given
class, a construction loan mortgage providing for advances
by plaintiff as the work progressed, a stated sum at certain
stages of construction. The project involved the erection
of 81 one-family houses, each on a slab foundation, mostly

houses of three bedrooms to sell for $12,600, the remainder
two bedroom houses to sell for $12,000. Plaintiff under-
took to advance to the developer, Closter, two-thirds of the
purchase price of the particular house in six payments as
the work proceeded: 20% when the slab was completed;
15% when the building was "rough enclosed," called "plate
and roof"; 20% when the building was ready to lath; 25%
when the white plaster was finished, called "white coat";
and 10% when the building was "substantially completed,"
the balance of 10% to be paid when the house was sold and
title was taken by the purchaser. This mode of construction
financing had been plaintiff's usual course for "many years."
Harrison was employed by plaintiff as an "inspector" to
certify the doing of the work entitling Closter to payment
according to the foregoing schedule; and the losses for which
recovery is now sought under the fidelity bond consist of
advances of mortgage money by plaintiff to Closter on the
basis of Harrison's certificates of construction work done
which were false in fact. The essential question is whether
Harrison's conceded default in the performance of duty to
his employer involved acts classable as "dishonest, fraudulent
or criminal," the terms measuring the contractual indemnity.

Harrison at the time of his engagement for service was
of the age of 65, apparently in "very good health," and
known to plaintiff as fully capable, competent and experienced
in the field. He was first employed by plaintiff in 1949 to
"solicit business" in Bergen County, where he resided. He
had had, said plaintiff's president, Mylod, "considerable ex-
perience in the building business," for as long as 25 years,
and was "very familiar with construction loans," and after
five or six months, in May 1950, he was given "the job of
making inspections in Bergen County"; He "was to inspect
each building for the progress of construction so he could
certify it had reached the stage agreed on and the amount due
at that stage was then earned by the builder." He had served
in this capacity on the construction of 105 houses comprising
a similar project financed by plaintiff known as Closter Vil-
lage No. 1; and there was "no loss there." Mylod instructed

him in the performance of his inspection duties; he was directed to go to the "responsible party in charge" and inquire as to what houses were "ready for inspection, in order to save time," and then to make a "personal inspection" and render an "inspection report" when he found the construction work had reached the payment stage so that plaintiff could "make the disbursements." The finished houses were to be sold to war veterans, each financed by means of a "permanent" mortgage guaranteed in part by the Federal Veterans Administration under a plan that placed the sale price under its control and the construction work subject to its inspection at given stages to insure conformance with the plans and specifications. The federal bureau had its own inspector. All this from plaintiff's president, who also said he told Harrison "we would meet the requirements of the builder, as we ordinarily do, when we received an inspection certificate required by the Veterans Administration"; plaintiff was borrowing a large part of the money to be advanced on its construction mortgage loan, and the lending bank "wanted those reports for the same purpose, to see whether those loans were eligible for veterans."

But Harrison fell into easy ways, to say the least. When financial reverses set in for Closter Village, Inc., eventuating in bankruptcy, it was found that he had made 92 false reports, involving 35 houses. In most there were overcertifications; as to four lots there were certifications of the completion of four stages of construction, although no work at all had been done. With one exception, all of the incorrect certifications occurred between February 14 and May 16, 1951; 1 in January; 9 in February; 33 in March; 43 in April; and 9 in May. He denied willful misrepresentation with intent to deceive his employer; he pleaded carelessness attributable in large part to the burden of his manifold duties; in addition to the Closter Village venture, he had some eight or nine similar projects under his supervision; on Monday he canvassed for new business; on Tuesday he "would start out very early in the morning because" it was "very hard to cover them all in a day" and, after a full

day in the field, he would work at home until midnight preparing the "Check Requisition" forms and deliver them the following day to plaintiff's office in Newark, and he "had to have the report of an inspection made by the Veterans Administration, coupled inside these forms"; in February 1951 a tornado dealt extensive damage to many houses in the earlier developments, and he was required to determine the damage done and whether repairs had been made, involving between 50 and 100 such claims; he had calls to make in relation to delinquent mortgages; and Friday was also a day devoted to soliciting new business. Such was his weekly schedule.

Plaintiff had had very satisfactory relations with Closter and its corporate officers on the prior projects. And Harrison relates this as an observation made by plaintiff's president: "Of course, you know these builders. They have been with us so many years. What I want you to do is — — — you will meet the superintendent named Sands. You work along with him and you will be all right." Mylod denied the statement thus attributed to him, but he agreed that other projects directed by Sands had been "successfully completed." He testified:

"Q. I ask you again whether you recollect saying anything to Mr. Harrison with reference to Mr. Sands, other than that Mr. Sands would be the foreman to see on that job.

A. I am sorry not to be able to recall. I can only say this to you—I am not trying to hold anything back. I knew nothing about Mr. Sands that was not good and if I was asked that question that I understood him to be a capable man, if I did not think so I would not have' financed them."

The witness told Harrison that on the completion of the first and third construction stages of every building it would be his duty to obtain from Closter the first and second V.A. inspector's certificates before any payment would be made, and he said that each of the 92 "Check Requisition" forms submitted by Harrison was accompanied by a V.A. certificate of the first and second inspections made by the V.A. inspector on the projects, one Goodsite, with whom "our ex-

perience had been good." The "Check Requisition" certified that the work therein specified "has been completed."

The false certifications, Harrison testified, were due to his reliance in good faith upon information supplied by Sands, seemingly of record in the latter's office on the site, accompanied by the V.A. inspection certificates, first or second. He said he "actually made an inspection of the buildings in Section 1," and in Section 2 "up to about March 5." He insisted he was not aware that the certifications here involved were "inaccurate"; but he acknowledged that where the reports "indicated the houses had reached a greater stage of construction than they actually had," he had not made "any inspection" at the time. He explained:

"The storm (in February, 1951) had caused all the sand from the eastern end to come down on the roadway. It filled up and all the storm drains and it was almost impossible for anyone to get up to the eastern section which was the top section of 2. That was the time I thought, 'Well, I have been with this fellow over a year' – – – Sands and I have seen people come in the homes they built, they are living there and I trusted him.

Q. You trusted him? A. I certainly did. It was a misplaced trust and that's all it was."

He was old, approaching 70, and not physically capable of ascending on foot the sloping Palisades construction terrain under the prevailing weather conditions; and there were no vehicular passages. He had no "intent to harm or defraud" plaintiff. "Q. You say you did not? A. I did not, no, no." When he learned, later on, from plaintiff's vice-president, Ozias, that his reports were "in fact inaccurate," he was "thunderstruck." He denied he told Ozias he was "conscious" that he was "overboard on these certifications" when they were made, but he "thought that they would pull out of it, that if they had gotten the money everything would be straightened out and the project would come out O.K." Neither Stiles nor the office secretary present, according to the witness Ozias, when the conversation was had was called to the witness stand. Harrison acknowledged he did not inform his employer at the time of his failure to make the

inspections for which he was employed. "I had not," he said, "the slightest idea that I was doing anything wrong." It was not that he considered the inspections "of no importance"; he had confidence in Sands; he "wasn't prepared for the top of the hill"; he "trusted" Sands "and worked with him so long and felt that the houses and everything to (his) mind was going smoothly." He was asked if he did not think his obligation to his employer obliged him to report his omission of personal inspections, and he replied: "No sir. I was afraid I would lose my job." But this circumstance is not in itself of conclusive force. There is no direct evidence of a seeking after lucre or gain.

The issue was twice tried to a jury. The first resulted in a 10-2 verdict of "no cause for action." Judge Ewart denied plaintiff's motion for judgment *non obstante veredicto* but granted an alternative motion for a new trial on the ground that, while the verdict was not the product of "partiality, prejudice or passion," it was "based upon a misapprehension or mistake of the jury" in that "by any commonsense standard, Harrison was guilty of a series of dishonest acts, knowing them to be dishonest, and extending over a period of from three to four months," and the plaintiff employer suffered loss as "the direct result of his derelictions," a conclusion, he thought, "not open to controversy among reasonable minds," thus indicating a "mistaken view" by the jury in assessing Harrison's "admitted conduct" in relation to the terms of the fidelity bond.

The retrial was had before Judge Colie. Plaintiff's motion at the close of the case for judgment as a matter of law was denied; and the jury were told to inquire as to whether Harrison's "acts" were "either dishonest or fraudulent," defined as involving "bad faith, a breach of honesty, one of integrity or moral turpitude," but that if the "actions" of Harrison "indicate a reckless, willful and wanton disregard for the interest of his employer, if it is an act manifestly unfair to the employer and palpably subjects the employer to the likelihood of a loss, that is something that you may take into consideration in determining whether or not that

which Mr. Harrison did in this case was dishonest." And there was recourse to the dictionary definition of the word "dishonest": "wanting in honesty or integrity, disposed to cheat or defraud, not trustworthy, characterized by fraud; indicating a want of probity."

Again, there was a verdict of no cause for action. And this was followed, notwithstanding the submission thus made to the jury, by an order vacating the judgment entered for defendant on the verdict and directing judgment for plaintiff, in keeping with the altered view that "intent to harm his employer or intent to profit from his acts" is not an "essential ingredient of an act to bring it within the category of dishonesty," but that "where an employee, as in this case, is employed to perform a series of acts and to certify a set of facts based on physical inspections, and that employee certifies to those facts, without having made the physical inspection, that then, intent to harm his employer becomes an irresistible inference, from that course of conduct having been pursued over a long period of time with the employee's full knowledge, that he is unfaithful to his employer; that he further lacks integrity and that brings him squarely within the definition of 'dishonest,' as it is stated in all of the standard dictionaries * * *." It was concluded that there was error in the denial of plaintiff's motion for judgment at the close of the evidence, and the "error defeated a just result" and, additionally, "the verdict * * * was against the weight of the evidence," and accordingly it was set aside.

"Dishonesty" is not a term of art. Although it has a broader connotation, in its primary sense it imports a baseness of nature and conduct—a willfully wrongful act or omission designed to harm or prejudice another, if not to enrich or advantage the wrongdoer. "Dishonest" is defined thus: "2. Characterized by fraud; indicating a want of probity; knavish; fraudulent; unjust; as dishonest profits. 3. Wanting in honesty or integrity; disposed to cheat or defraud; not trustworthy; as, a dishonest man." "Dishonesty": "2. Want of honesty, probity or integrity in prin-

ciple; want of fairness and straightforwardness; a disposition to defraud, deceive, or betray; faithlessness. 3. A dishonest act; a fraud; any deviation from probity." "Fraud" also has the element of willfulness: "Deception deliberately practiced with a view to gaining an unlawful or unfair advantage; deceitfulness; deceit; trickery; cheating." "Honesty" is the general term for freedom from fraud or imposture. *Webster's New International Dictionary* (*2d ed.*); *Webster's New World Dictionary*. "Fraud" consists of some deceitful practice or willful device, resorted to with intent to deprive another of his right, or in some manner to do him an injury. *Maher v. Hibernia Insurance Co.*, 67 *N. Y.* 283 (*Ct. App.* 1876); *Alexander v. Church*, 53 *Conn.* 561, 4 *A.* 103 (*Sup. Ct. Err.* 1885); *Studer v. Bleistein*, 115 *N. Y.* 316, 22 *N. E.* 243, 5 *L. R. A.* 702 (*Ct. App.* 1889). "Bad faith" and "fraud" are synonymous, and also synonyms of dishonesty, infidelity, faithlessness, perfidy, unfairness, etc. *Black's Law Dictionary* (*4th ed.*) "Dishonesty" may imply the act or the habit of willfully perverting the truth, but it also may suggest the act or habit of stealing, cheating, or defrauding; as a dishonest statement; a dishonest merchant or employee or lawyer or historian. *Webster's Dictionary of Synonyms.*

A word takes color from its associates. The particular set of words, "dishonest, fraudulent or criminal act," was designed to express and, by the same token, to delimit the contractual indemnity. These terms plainly exclude liability for loss by negligence, no matter how gross. It is not a question of the degree of negligence or culpability through default in the performance of the contractual undertaking, but rather a willful and intentional design to practice fraud or to work injury upon the indemnitee. The words "reckless," "indifferent," "careless," and "wanton" are never understood to signify positive will or intention, "unless joined with other words which show that they are to receive an artificial or unusual interpretation, if not an unnatural interpretation." *City of Lexington v. Lewis' Administratrix*, 10 *Bush* (*Ky*) 677 (*Ct. App.* 1874). "Gross negligence" is substantially higher

in magnitude than simple inadvertence, but falls short of intentional wrong. *Young v. City of Worcester, 253 Mass.* 481, 149 *N. E.* 204 (*Sup. Jud. Ct.* 1925). Such is the genius of the expression here, the reason and spirit of the words used to declare the nature and scope of the indemnity. *Noscitur a sociis* embodies the general principle that a contract is to be interpreted as a whole. It is an old maxim in aid of intention, epitomizing the rule both of language and of law that the meaning of words may be indicated or controlled by those with which they are associated. *Williston on Contracts* (*rev. ed*), *section* 618.

The parties were at liberty to do their own bargaining and to settle their reciprocal rights and duties, subject only to the restraints of positive law and public policy; and their respective undertakings may not by judicial construction be enlarged beyond the fair and reasonable import of the chosen symbols of expression, taken and compared together in relation to the context and the apparent purpose of the compact. Particular words are controlled by the general meaning, if that be clear and manifest. *Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 *N. J.* 293 (1953). We look for the operative meaning of the tokens of intention thus designed to affect the legal relations of the parties; and, according to the terms their fair and reasonable meaning, the indemnitor's liability is *strictissimi juris. George M. Brewster & Son, Inc., v. Catalytic Construction Co.,* 17 *N. J.* 20 (1954). Where a word has different senses, it takes its meaning from the associated words and the context. *Gusaeff v. John Hancock Mutual Life Ins. Co.,* 118 *N. J. L.* 364 (*Sup. Ct.* 1937).

In somewhat similar circumstances, where the indemnity covered loss through "any act or acts of fraud, dishonesty, larceny, embezzlement, forgery, or wrongful extraction" committed by the indemnitee's employees, the Pennsylvania Supreme Court held that "the acts of dishonesty and fraud which come within the meaning here disclosed are acts done for the purpose of harm or with a view to personal profit. The reports of Gregory, standing alone, were not sufficient to

sustain the action. Oral evidence was necessary to show the circumstances under which the reports were made. They may have been the result of mistaken neglect or overconfidence in the dealer. Negligence, a mere dereliction in the terms of an employment, a misstatement not accompanied by designed interest to defraud or to profit thereby, are not acts of dishonesty or fraud such as are within the contemplation of this bond. To hold otherwise would impose a most unusual burden upon appellee, and one, we think, never contemplated by the contracting parties"; and "since the nature of Gregory's acts had to be judged from oral evidence, it became a question for the jury." *Universal Credit Co. v. United States Guarantee Co.*, 321 *Pa.* 209, 183 *A.* 806, Kephart, C. J. (*Sup. Ct.* 1936). See also *Bank of Erie Trust Co. v. Employers' Liability Assurance Corporation*, 322 *Pa.* 132, 185 *A.* 224, 104 *A. L. R.* 1170 (*Sup. Ct.* 1936). There it was said in relation to the phrase "dishonest or criminal act," in like usage: "An act may be criminal or otherwise according to the intent with which it is performed, and for an act to be 'dishonest' there must first be the element of moral turpitude or want of integrity."

In the case of a bank teller who made payment of checks in violation of a rule of the bank forbidding payments to a depositor against uncollected items of deposit without the consent of the president or, at times, another officer, Cardozo, C. J., considering the bank's contention that the teller was guilty, as a matter of law, of a dishonest or criminal act within the intendment of indemnity against loss through any "dishonest or criminal act," declared:

"We think the quality of the act is not so obvious and determinate as to exclude opposing inferences. * * * Criminal the act was not, unless done with criminal intent. * * * The presence of that intent is not, in the setting of these circumstances, an inference of law. The question is perhaps closer whether the act within the meaning of the policy must be said to be 'dishonest,' for dishonesty within such a contract may be something short of criminality. * * * The appeal is to the mores rather than to the statutes. Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an in-

firmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men. * * * If this standard is to govern, we think the quality of the teller's act is for the triers of the facts. He was not acting *lucri causa*, to gain some benefit for himself. He was not acting with the thought of giving anything to any one, or so the triers of the facts might say. * * * The act was a wrongful one, very likely a technical conversion, certainly a departure from instructions, but in the common speech of men there would be reluctance to describe it as flagitious or dishonest." *World Exchange Bank v. Commercial Casualty Insurance Co.*, 255 N. Y. 1, 173 N. E. 902 (*Ct. App. 1930*).

And such was the case here with two juries sworn to resolve the issue as one of fact.

And in *Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland*, 202 F. 2d 794, 37 A. L. R. 2d 889 (*7th Cir. 1953*), involving a fidelity bond covering losses "through fraudulent and dishonest acts," the Seventh Circuit Court of Appeals held:

"It is not a necessary condition that the employee personally profit by his acts. * * * However, mere negligence, mistake, or error in judgment would not ordinarily be considered a dishonest act. Acts resulting from incompetence cannot be characterized as dishonest. Under the circumstances of this case we think that the issue of whether Smith's acts constituted dishonesty within the meaning of the term in the bond was a fact question for the jury to decide. This court, in *London & Lancashire Indemnity Co. of America v. People's Nat. Bank & Trust Co.*, 7 Cir., 59 Fed. 2d 149, 1952, said, 'If it indicates a reckless, willful, and wanton disregard for the interest of the employer — — — if it be an act manifestly unfair to the employer and palpably subjects him to likelihood of loss — — — a fact question of liability for loss thereby ensuing, as from a dishonest act, is fairly raised.'"

In *Humbird Cheese Co. v. Fristad*, 208 Wis. 283, 242 N. W. 158 (*Sup. Ct. 1932*), the rule was stated thus:

"It seems too clear to require citation of authority to support it that negligence is not fraud. * * * And acts resulting from mistake of judgment are not acts of fraud or dishonesty any more than are acts done negligently."

See also *Fidelity & Deposit Co. of Maryland v. Bates*, 76 F. 2d 160 (8th Cir. 1935) ; *Mortgage Brokerage Co. v. Mills*, 100 Colo. 267, 67 P. 2d 68 (*Sup. Ct. 1937*).

The issue here concerns the primacy of the jury in its constitutional sphere of resolving the facts and the inferences derivable from proved circumstances. It was the exclusive province of that tribunal to assess the proofs and determine whether the elements of fraud or dishonesty within the concept of the contractual indemnity had been established by a preponderance of the evidence. The question of one's intent or belief, of a fraudulent or dishonest design or purpose, is ordinarily in its very nature an inquiry for the jury. Compare *Hebrew v. Pulis*, 73 *N. J. L.* 621 (*E. & A.* 1906). And the terms of indemnity, as we have seen, import moral or conscious wrong or delinquency. Only when the proofs fairly and reasonably admit of but one conclusion does the question become one of law for the court. Where the evidence is sufficient to raise the question of intent, it is the duty of the court to submit the question to the jury. *Cornett (Nash) v. Williams*, 20 *Wall.* 226, 22 *L. Ed.* 254 (1874); *Hall v. Stevens*, 116 *N. Y.* 201, 22 *N. E.* 374, 5 *L. R. A.* 802 (*Ct. App.* 1889). But whether a verdict is against the weight of the evidence is a judicial question within the constitutional appellate process. The constitutional right of trial by jury, 1947 *Constitution, Article* I, *paragraph 9*, does not render immune to appellate review a verdict that plainly transcends the province of the jury, assessed by the time-honored formula signifying clear unreason and injustice. The verdict may not be set aside simply because, in the court's opinion, the jury upon the evidence might well have found otherwise; the court may not merely weigh the evidence where it is fairly susceptible of divergent inferences and substitute its own judgment for that of the jury. *Hager v. Weber*, 7 *N. J.* 201 (1951).

The plaintiff indemnitee relies heavily on *Cowley v. Smyth*, 46 *N. J. L.* 380 (*Sup. Ct.* 1884), an action at law in deceit. But that case differs in principle from the case at hand. In an action of deceit to recover damages for a false and fraudulent representation, the requisite fraudulent design is derivable from proof that the représentation was false to the defendant's knowledge, or in the more complex form

where the defendant has added to a representation — — — which turns out to be untrue, but was not false to his own knowledge — — — an affirmation that he made the representation of his own knowledge, *i. e.*, that he had the requisite knowledge to vouch for the truth of his assertion respecting a specific fact susceptible of exact knowledge, such being untrue, the falsehood would be willful and therefore fraudulent. But here we have, not an action by the employer for damages ensuing from the employee's breach of the contract of service, but rather an action on the insurer's undertaking to indemnify against loss from the employee's "dishonest, fraudulent or criminal act," terms importing moral obliquity. And in *Cowley v. Smyth* it was said that it is the jury's function to determine "whether, upon the evidence, the defendant made the representations with a fraudulent purpose to deceive, or whether he made them in good faith and in the honest belief that they were true." To the same effect is *Bingham v. Fish*, 86 *N. J. L.* 316 (*E. & A.* 1914), also cited by plaintiff.

The response of the jury on each submission of the issue was in the negative; and defendant is now entitled to judgment on the verdict. A second concurring verdict on substantially the same evidence will not be set aside unless there be a clear showing of injustice. *Van Blarcom v. Kip*, 26 *N. J. L.* 351 (*Sup. Ct.* 1857); *Demarest v. Little*, 47 *N. J. L.* 28 (*Sup. Ct.* 1885); *Brown v. Paterson Parchment Paper Co.*, 69 *N. J. L.* 474 (*Sup. Ct.* 1903); *Crawford v. Van Gaasbeek*, 95 *N. J. L.* 1 (*Sup. Ct.* 1920). A second new trial will rarely be directed save for error of law. *Louisville & N. R. Co. v. Woodson*, 134 *U. S.* 614, 10 *S. Ct.* 628, 33 *L. Ed.* 1032 (1890).

At common law, a judgment *non obstante veredicto* was in its origin a species of judgment on the pleadings, available only to the plaintiff. *Rospond v. Decker*, 109 *N. J. L.* 458 (*E. & A.* 1932); *Slocum v. New York Life Insurance Co.*, 228 *U. S.* 364, 33 *S. Ct.* 523, 57 *L. Ed.* 879 (1913). See *Hall v. United States*, 168 *U. S.* 632, 18 *S. Ct.* 237, 42 *L. Ed.* 607 (1898); also *Attorney General ex rel. Dalenz v. Fitz-*

*simmons*, 78 *N. J. L.* 618 (*E. & A.* 1910), where the issue joined upon a plea to an information in *quo warranto* was immaterial, and such that it could not be cured by repleader, the plea failing to show the respondent's title to the office.

Apropos of the Seventh Amendment to the Federal Constitution, securing the common-law right of trial by jury in civil cases, Justice Storey said that the common law alluded to is the common law of England, "the grand reservoir of all our jurisprudence," and "according to the rules of the common law, the facts once tried by a jury are never reexamined, unless a new trial is granted in the discretion of the court before which the suit is depending, for good cause shown; or unless the judgment of such court is reversed by a superior tribunal, on a writ of error, and a *venire facias de novo* is awarded. This is the invariable usage settled by the decisions of ages." *United States v. Wonson, Fed. Cas. No.* 16,750, 1 *Gall.* 5, 20 (1812). And in *Parsons v. Bedford*, 3 *Pet.* 433, 7 *L. Ed.* 732 (1830), the same learned jurist, speaking of this constitutional guaranty of the right of trial by jury, again observed that the "only modes known to the common law to reexamine such facts" tried by a jury "are the granting of a new trial by the court where the issue was tried, or to which the record was properly returnable; or the award of a *venire facias de novo* by an appellate court for some error of law which intervened in the proceedings."

In the *Slocum* case, cited *supra*, Justice Van Devanter referred to "two well-recognized instances" at common law "in which the verdict could be disregarded and the case disposed of without a new trial. One was where the defendant's plea confessed the plaintiff's cause of action and set up matter in avoidance which, even if true, was insufficient in law to constitute a bar or defense; and the other was where the plaintiff's pleading, even if its allegations were true, disclosed no right of recovery. If in either instance a verdict was taken, the court nevertheless could make such disposition of the case as was required by the state of the pleadings, and this because the issues settled by the verdict were wholly immaterial. In the first instance the court's action was

invoked by a motion for judgment *non obstante veredicto*, and in the latter by a motion to arrest judgment on the verdict." But in the later case of *Baltimore & Carolina Line v. Redman*, 295 *U. S.* 654, 55 *S. Ct.* 890, 79 *L. Ed.* 1636 (1935), Justice Van Devanter, citing English cases and law writers, referred to a "well established practice" at common law "of reserving questions of law arising during trials by jury and of taking verdicts subject to the ultimate ruling on the questions reserved; and under this practice the reservation carried with it authority to make such ultimate disposition of the case as might be made essential by the ruling under the reservation, such as non-suiting the plaintiff where he had obtained a verdict, entering a verdict or judgment for one party where the jury had given a verdict to the other, or making other essential adjustments." See also *Aetna Insurance Co. v. Kennedy*, 301 *U. S.* 389, 57 *S. Ct.* 809, 81 *L. Ed.* 1177 (1937).

Thus, prior to the promulgation of *Federal Rule* 50 in 1937, the trial court could not entertain a motion for judgment *non obstante veredicto*, for insufficiency of the evidence, unless it had reserved decision on the motion for a directed verdict according to the course of the common law. It was solely in this wise that there could be a re-examination of the facts for sufficiency as a matter of law. The only qualification of the common-law practice effected by *Federal Rule* 50 was to make the reservation automatic. *Moore's Federal Practice* (*2d ed.*), *sections* 50.07, 50.08, 50.09.

There have been statutory enlargements elsewhere of the particular common-law process, but none in New Jersey. In the formulation of the rules of practice and procedure under the 1947 Constitution, this court considered *Federal Rule* 50, yet made no change in the existing practice. It is the established rule here that the power of the appellate tribunal to direct the entry of judgment final, on reversal of the judgment under review, is exercisable "only when the facts have been stipulated, or the evidence is uncontroverted and the issue one purely of law." *United States Fidelity and Guaranty Co. v. Davis*, 12 *N. J.* 365 (1953). See also *Slocum v.*

*New York Life Insurance Co.,* cited *supra,* where reference was made to the "real value" of the common-law procedure "because, in addition to fully recognizing that right, it afforded an opportunity for adducing further evidence rightly conducing to a solution of the issues."

By statute in other jurisdictions, a judgment is enterable notwithstanding the verdict on undisputed evidence or no evidence at all, a course that does not trespass upon the province of the jury. There is in this regard a distinction of substance between the power of the trial court, after setting aside a verdict, to enter judgment *non obstante veredicto,* according to a motion made for a directed verdict, and the power to order a new trial. It is not ground for directing a verdict that the evidence is decidedly preponderant in favor of the party so moving. In the one case, affirmative action constitutes a final disposition of the cause; in the other, it makes necessary the submission of issues to another jury. The difference in function is well stated by Judge Parker in *Garrison v. United States,* 62 *F. 2d* 41 (*4th Cir.* 1932):

> "(T)he contention is frequently made that the judge should direct a verdict whenever the evidence is such that he would be justified in setting the verdict aside. The distinction, however, is clear. Where there is substantial evidence in support of plaintiff's case, the judge may not direct a verdict against him, even though he may not believe his evidence or may think that the weight of the evidence is on the other side; for, under the constitutional guaranty of trial by jury, it is for the jury to weigh the evidence and pass upon its credibility. He may, however, set aside a verdict supported by substantial evidence where in his opinion it is contrary to the clear weight of the evidence, or is based upon evidence which is false; for, even though the evidence be sufficient to preclude the direction of a verdict, it is still his duty to exercise his power over the proceedings before him to prevent a miscarriage of justice. See *Felton v. Spiro,* (*6th Cir.*), 78 *F.* 576. Verdict can be directed only where there is no substantial evidence to support recovery by the party against whom it is directed or where the evidence is all against him or so overwhelmingly so as to leave no room to doubt what the fact is. *Gunning v. Cooley,* 281 *U. S.* 90, 50 *S. Ct.* 231, 74 *L. Ed.* 720 (1930). Verdict may be set aside and new trial granted, when the verdict is contrary to the clear weight of the evidence, or whenever in the exercise of a sound discretion the trial judge thinks this action necessary to prevent a miscarriage of justice."

And in *Mt. Adams & E. P. Inclined R. Co. v. Lowery,* 74 *F.* 463, 476 (*6th Cir.* 1896), Justice Lurton, then a circuit judge, said that

"there is a difference between the legal discretion of the court to set aside a verdict as against the weight of evidence, and that obligation which the court has to withdraw a case from the jury, or direct a verdict, for insufficiency of evidence. In the latter case it must be so insufficient in fact as to be insufficient in law; in the former case it is merely insufficient in fact, and it may be either insufficient in law, or may have more weight, and not enough to justify the court, in exercising the control which the law gives it to prevent unjust verdicts, to allow a verdict to stand. * * * We do not think, therefore, that it is a proper test of whether the court should direct a verdict, that the court, on weighing the evidence, would, upon motion, grant a new trial. A judge might, under some circumstances, grant one new trial and refuse a second, or grant a second and refuse a third. In passing upon such motions he is necessarily required to weigh the evidence, that he may determine whether the verdict was one which might reasonably have been reached. But, in passing upon a motion to direct a verdict, his functions are altogether different. In the latter case we think he cannot properly undertake to weigh the evidence. His duty is to take that view of the evidence most favorable to the party against whom it is moved to direct a verdict, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for the party having the onus."

See also *Butte Copper & Zinc Co. v. Amerman,* 157 *F.* 2d 457 (*9th Cir.* 1946); *Adams v. United States,* 116 *F.* 2d 199 (*7th Cir.* 1940); *Barron and Holtzoff, Federal Practice and Procedure, section* 1080. The "state of a man's mind is as much a fact as the state of his digestion." *Edgington v. Fitzmaurice, L. R.* 29, *C. D.* 483; 55 *L. J. Ch.* 650 (1885). Issues that depend on the credibility of the witnesses are for the jury. *Brady v. Southern R. Co.,* 320 *U. S.* 476, 64 *S. Ct.* 232, 88 *L. Ed.* 239 (1943).

Here, both trial judges conceived the evidence to be sufficient to take the case to the jury; and in each instance there was a submission of the issue without reservation of the question of law raised by the motion to direct a verdict; and thus there was no jurisdiction to enter judgment notwithstanding the verdict.

I would reverse the judgment for plaintiff and direct the reinstatement of the earlier judgment for defendant entered on the jury verdict.

Mr. Justice OLIPHANT and Mr. Justice WACHENFELD join in this opinion.

*For reversal and entry of judgment*—Chief Justice VANDERBILT, and Justices BURLING, JACOBS and BRENNAN—4.

*For reversal*—Justices HEHER, OLIPHANT and WACHENFELD—3.